**Samuel BERKOWITZ, Claimant, Appellant,**

v.

**UNITED STATES of America, Libellant, Appellee.**

**No. 6411.**

United States Court of Appeals
First Circuit.

Jan. 6, 1965.

Sheldon Newman, Chelsea, Mass., with whom Leader & Newman, Chelsea, Mass., were on brief, for appellant.

William B. Duffy, Jr., Asst. U. S. Atty., with whom W. Arthur Garrity, Jr., U. S. Atty., was on brief, for appellee.

Before WOODBURY, Chief Judge, ALDRICH, Circuit Judge, and WYZANSKI, District Judge.

WYZANSKI, District Judge.

This case presents the issue whether when an agent of the United States Government has unlawfully arrested a person and, incident to that unlawful arrest, has taken from him, in violation of the Fourth Amendment to the United States Constitution, his property, the Government, over that person's objection, can maintain a libel to forfeit that property if the Government shows that the property was intended for use in violating the internal revenue laws.

The relevant statutory provisions are codified in 26 U.S.C. §§ 7302 and 7321, which provide:

> § 7302 "It shall be unlawful to have or possess any property intended for use in violating the provi-

sions of the internal revenue laws, or regulations prescribed under such laws, or which has been so used, and no property rights shall exist in any such property. * * * "

§ 7321 "Any property subject to forfeiture to the United States under any provision of this title may be seized by the Secretary or his delegate."

The basic facts are undisputed.

April 5, 1962 Deputy United States Marshal Baldwin arrested Berkowitz and took from his possession, without his consent, $3,960.81 in United States currency and coins and also four negotiable checks. For convenience, all of these items will be called "Berkowitz's money"—though, of course, they are not all strictly speaking "money", and this Court does not suggest that Berkowitz had title to the money, or more than a right of immediate possession as against a wrongful taker.

Berkowitz was brought to trial in a criminal case in the District of Massachusetts on a charge of wilfully violating the federal wagering tax statute: U. S. v. Berkowitz, Cr. No. 63–259–F. Responding to a motion to suppress evidence in that case, Judge Ford held that Baldwin had unlawfully arrested Berkowitz, that the money had been seized from Berkowitz as an incident of that arrest, and that, therefore, the motion to suppress should be granted.

Thereafter, on July 16, 1963, the Government filed in the District of Massachusetts the instant civil action in the form of a libel for the forfeiture of the same money, on the ground that it had been used, and was intended to be used, in violation of the above-quoted 26 U.S.C. § 7302, and was subject to forfeiture under the above-quoted 26 U.S.C. § 7321: U. S. v. $3,960.81 etc., Misc. Civ. No. 63–38–C.

August 6, 1963, in answer to the libel, Berkowitz claimed that the money was his, that it had been unconstitutionally seized from him by agents of the United States at the time he was arrested, and that his right was superior to that of the agents. He prayed that the Court return the money to him.

That the answer was factually correct in describing when and from whom the property had been seized by the United States had been admitted proleptically in the eighth paragraph of the Government's libel.

June 12, 1964 Judge Caffrey found that the money had been taken from Berkowitz at the time of his arrest on April 5, 1962 (Fdg. 3); that the arrest was unlawful (Fdg. 4); that Judge Ford had suppressed the use of the money as evidence at the criminal trial (Fdg. 4); and that the money taken from Berkowitz was at the time of its seizure being used in violation of those internal revenue laws (Fdg. 10). Possibly in reliance upon his belief that the recent decision of this Court in Interbartolo v. United States, 303 F.2d 34 (1st Cir.) precluded him as a District Judge from an independent and fresh consideration of the appropriate rule of law, Judge Caffrey concluded that in a forfeiture action the Government need show no more than that the libeled articles were used in violation of the internal revenue laws, and that it was no answer for a claimant to prove that the articles had been seized from him in violation of his rights under the Fourth Amendment to the United States Constitution. Hence, Judge Caffrey entered on June 12, 1964 a decree of forfeiture of this money.

From that decree Berkowitz appeals, on the grounds that the money having been seized by the Government from him in violation of his constitutional rights under the Fourth Amendment, and that that fact having been established first by the prior judgment of Judge Ford, and second, in the instant case by Judge Caffrey, acting apparently de novo, it follows as a matter of law that the lower court in this case had no proper possession of the libeled money, that the court's decree of forfeiture was therefore improper, and that, as the possessor of the money at the time of the seizure, Berkowitz was entitled to a decree returning

the money to him, as prayed in his answer.

This Court, as now composed, is unanimous in holding that the decree must be reversed and the money returned to Berkowitz. Some members of this Court would be satisfied with a broad statement to the effect that the Government cannot confiscate property seized in violation of the Fourth Amendment. But while the writer of this opinion accepts wholeheartedly that conclusion, he prefers to reach that result only after a detailed analysis of certain difficulties.

That "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated" is the cherished command of the Fourth Amendment to the United States Constitution. Sitting as we do within one block of "the old State House [where], we remember, James Otis argued the case of the writs of assistance, and in that argument laid one of the foundations for American constitutional law" [O. W. Holmes, Collected Legal Papers, (London 1920), speech on John Marshall, p. 266,] we need no further reminder of how basic to the American concept of liberty is the right of men to be left in possession of their effects unless valid authority for disturbing that possession can be shown based on principles of the common or enacted law. We need not rehearse here the historical, political, and ethical considerations underlying the Amendment. The American view of ordered liberty finds no clear distinction from totalitarianism or other forms of despotism than in our recognition that privacy is a principal object of civilization. We are held together as a community by our respect for one another.

The Fourth Amendment does not list the sanctions by which its high objects are to be maintained. But the courts have always known that, unless the language of the Amendment were to be reduced to mere rhetoric, it was imperative that when the Government violated Constitutional commands it should not be allowed to use its misconduct for its own advantage. Disregard of constitutional rights is not to be ignored even if it would achieve some goal asserted by the Government of the day to be superior to the permanent interest that the Constitution proclaims in leaving men to enjoy their privacy. Privacy prevails except in those specific situations when it has been opened up for inspection or seizure by a process authorized by the law, such as lawful arrests or warrants issued, as the Fourth Amendment provides, "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The awareness of the obligation resting upon courts to develop sanctions to fulfil the promise of the Fourth Amendment led, long since, to the firm rule, in criminal prosecutions and civil actions brought by the Government, excluding from admission in evidence any property seized by Governmental agents in violation of the Fourth Amendment. The *locus classicus* to which later judges have always returned for quotation is Mr. Justice Bradley's opinion in Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746. No student of our law needs to be reminded that Mr. Justice Bradley drew upon the principles argued in Entick v. Carrington, 19 Howell's St. Tr. 1029 (C.P. 1765); nor that the Boyd case led to the rule in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, that papers illegally seized by federal officials could not be received in evidence in federal trials. The recent extension of this principle to state officials and state trials, by an enlarged view of the Fourteenth Amendment, is familiar even to casual readers of newspapers. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081. Indeed almost every Justice of the Supreme Court in the second half of this Century, as well as distinguished academic jurists through their most significant writings, have added depth to Mr. Justice Bradley's powerful early statement. What emerges from these resounding declarations is the rule that even where

there are present the very great interests of society first, in adjudging the conduct of a defendant charged with the most reprehensible crimes, and, second, in disabling him, if guilty, from continuing as a menace to the peaceful existence of the rest of us, nonetheless unconstitutionally seized evidence may not be used to convict him. The safety of our society depends more upon the preservation of fundamental liberties than upon the punishment of a person whose offense we can prove only through subverting those liberties.

Under a scale of values which has led courts, in cases where articles have been unconstitutionally seized at a time of an unlawful arrest, to give privacy precedence over punishment, it is clear that privacy must have precedence over confiscation. Mr. Justice Holmes's cryptic opinion in Dodge v. United States, 272 U.S. 530, 532, 47 S.Ct. 191, 192, 71 L.Ed. 392, does not assert the contrary. What he was concerned with was the forfeiture of a boat which had been seized without statutory authority—not, note well, by any violation of the Fourth Amendment. So we are not in the present case affected by Justice Holmes's remark that "The exclusion of evidence obtained by an unlawful search and seizure stand[s] on a different ground" from the seizure of a visible boat by a means merely unauthorized by statute. Here we have a violation of the Constitution. What the Government is seeking in the case at bar is to put its interest in forfeiting some money which was used to commit a crime ahead of the public's interest in keeping actions of Government agents within Constitutional boundaries. Our choice between these interests must favor the interest of constitutionality unless we are to betray our historic commitments and our living faith.

Insofar as Interbartolo may be thought to have had a different approach, and not to be distinguishable on the same reasoning as we have just applied to Dodge v. United States, it cannot stand as against the current of consti-

tutionalism on which our ship of state is carried.

We refrain from any analysis of certain other cases cited to us, but in which this Court did not sit. Whether the Supreme Court of the United States will bury those opinions at a future date we cannot know. It is enough for us to conclude that though, sitting alone, a District Judge may well have deferred to radiations from the central points of those cases, we, knowing that our acquiescence in Judge Caffrey's exercise of judicial humility (since it would probably make ineffective a petition for certiorari) might forever deprive Berkowitz of what we conceive to be his rights, prefer to adhere to what we now regard as sound constitutional doctrine and to leave the Government, if it thinks we have not been duly deferential to older decisions, to file a petition for certiorari on that basis.

Before this opinion is concluded we should make it plain that we have not overlooked the precise words of 26 U.S.C. § 7302, wherein Congress declared that "no property rights" shall exist in property intended for use in violating the provisions of the internal revenue laws. No doubt, that language is susceptible of entirely constitutional application in some situations, as, for example, where the Government acting upon a valid search warrant has seized property. But the Government's effort to have the statute enforced according to its letter in this case is an attempt to apply the act in violation of the Fourth Amendment to the Constitution.

The last sentence in the last paragraph requires elaboration, and calls for what may strike one, at least at first, as an unduly complicated analysis.

In its argument the Government reads the provision of 26 U.S.C. § 7302 which declares that "no property rights shall exist" in "property intended for use in violating the provisions of the internal revenue laws" as having the net effect of leaving nothing, literally nothing, which the holder or possessor of such

property can validly claim is protected by the Fourth Amendment against seizure. The contention is that if this Court vindicates such a claim by throwing around it the mantle of the Constitution the Court would be creating, not merely protecting, an interest.

To support its thesis the Government appears to be proceeding on the reasoning that property is always the creature of either common law or statutory law. The suggestion is that while physical substances and concrete relations of men to things exist by virtue of natural "laws", abstract relations of men to things exist by virtue of social structure, that is by positive laws, customs, or ways of interpreting political, economic, social, or other cultural ideas. "Mine" and "Thine" are short-hand summaries of the social laws. To give each man his due (the test which Justinian made so famous a juristic maxim and which in an earlier form is found in Romans 13:7) is only to give him what society says is owing,—nothing more. And society may change the structure of social obligation or legal order or property rights whenever it pleases.

All this would be true enough if we were not a constitutional state,—(not to mention that we have a federal structure wherein property owes its existence to the states and cannot therefore be regarded as the creature of the national government). Our adoption of a constitution places a limit upon the unfettered right of a present majority to enact whatever legislation it likes, or to alter the legal structure, or to create or undermine binding customs, or to destroy property rights without compensation. The Constitution not merely recognizes but, in strictest juristic theory, legally creates durable interests which have priority over fashions of a momentary majority. This is perhaps most easily seen by taking a side glance at the Fifth Amendment's imperative "nor shall private property be taken for public use, without just compensation." Not even in the District of Columbia could Congress validly declare that there shall be no private property rights in, let us say, land, and then take that land for public buildings without paying just compensation. The private holder's interest in land is so anchored in the Constitution that to destroy the system of property in land without compensation would be a violation of the Constitution. Cf. Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322. Let it not be thought that the extraordinary doctrine applied in Mugler v. State of Kansas, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 could be stretched to abolish without compensation all rights in property of an ordinary kind, that is property which was admittedly non-deleterious, not a threat to health, safety, welfare, and morals, and otherwise entirely respectable. See O. W. Holmes' letter of January 13, 1923 to H. J. Laski in Holmes-Laski Letters (Howe ed.) vol. I, p. 473. The medicines which courts administer when liquor is involved have their own peculiar emotional or, conceivably, rational elements, and are not suitable prescriptions for the generality of cases.

To return to the exact point in the case at bar, Congress cannot by declaring that money is not property if used in violation of the internal revenue laws preclude one who had physical possession of that money from effectively asserting such Constitutional claim as he may have based upon the brute fact of his possession.

The Constitution recognizes that there is some sort of interest which a possessor has in the thing he has under his physical control. That recognition cannot be legislatively denied *in toto*, that is, to the point of not allowing it to be weighed in the judicial scales. No doubt, Congress may reduce the value of that interest by limiting the occasions when it can be exercised, or the manner in which it is exercised. And, of course, Congress can require, except (as here) where the Constitution otherwise commands, that that interest should be subordinate to, or reconciled with, other interests.

But if the interest is impliedly or expressly called into existence by one of the guarantees of the Constitution, Congress cannot preclude the holder of the interest from bringing it before a court of competent jurisdiction for evaluation and such vindication as it deserves on the merits. Somewhere in our constitutional regime, *so long as it remains constitutional*, the holder of the interest has a right to present for adjudication and appraisal by an independent court his claim that his interest has been cut off by the allegedly unconstitutional application of an Act of Congress. This is included in the very definition of constitutionalism, as we have understood that term in the United States since 1803 when Marshall, C. J., read his opinion in Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60. The grandeur of our constitutional system is that it assures even a squalid possessor of the proceeds of the gambler's craft that he shall not have his money taken in violation of the Constitution. If he proves it has been, the wronged man will get back his property, and the Governmental violators of the Constitution will not be allowed to enrich the Treasury by their defiance of fundamental liberties.

The upshot of this extended discussion is that this Court *either* must read 26 U.S.C. § 7302 as though it did not deprive Berkowitz of that kind of property right which entitles him as a bare possessor to complain of a seizure violating the Fourth Amendment [Cf. Jones v. United States, 362 U.S. 257, 266, 267, 80 S.Ct. 725, 4 L.Ed.2d 697; Stoner v. California, 376 U.S. 483, 488–490, 84 S.Ct. 889, 11 L.Ed.2d 856] *or* must declare that in attempting so to deprive Berkowitz the statute is in that particular application unconstitutional because violative of the Fourth Amendment. It is always more prudent to choose the form of expression which states that Congress could not have intended what its words appear to say, than the form which states that Congress meant what it said but we cannot give effect to what was said because it is repugnant to the Constitu-

tion. So we shall take the first choice, thus saving the statute by a generous exercise of our powers of construction. Our free rendering of 26 U.S.C. § 7302 is that it means that no property rights shall exist in property used to violate the internal revenue laws if (1) it is procured by a search warrant, as stipulated in the second sentence of 26 U.S.C. § 7302, or (2) it is otherwise lawfully seized by the Government, or (3) otherwise reaches the Government or the Court without any violation of the Constitution by anyone. Such an interpretation of the statute is plausible. It does no violence to any expressed or clearly implied intent of Congress. It gives an efficient, law-abiding administrative branch of the Government adequate scope. It carries out the spirit which Mr. Justice Holmes in Dodge v. United States, 272 U.S. 530, 532, 47 S.Ct. 191, 192, found had animated the exclusion of evidence obtained by an unlawful search and seizure: to wit, "If the search and seizure are unlawful as invading personal rights secured by the Constitution those rights would be infringed yet further if the evidence were allowed to be used." That principle applies here. If the seizure of Berkowitz's bankroll was unlawful as invading personal rights secured by the Constitution (and that is what both Judge Ford and Judge Caffrey found) those rights would be infringed yet further if the Government appropriates to itself that bankroll. The Government cannot be allowed to benefit from its infringement of Constitutional limitations.

Judgment will be entered vacating the judgment of the District Court and remanding the case with directions to return to Berkowitz the $3,960.81 in currency and coins and the four checks claimed by him in his answer.

ALDRICH, Chief Judge (concurring).

Senior Judge Woodbury and I cannot subscribe to Judge Wyzanski's opinion. Particularly we do not see the difficulties to which he refers, or the need, or the correctness, of tailoring 26 U.S.C. § 7302

to make it say what to us it quite obviously does not. The issue here is a narrow one. It is not whether Congress can declare without limitation that no property rights exist in property, here currency, intended for unlawful use, but is whether the government should be permitted to enforce a forfeiture (§ 7321) when it discovered and seized that money only by virtue of a direct invasion of Berkowitz's constitutional rights. We think the answer clear, not because it would be unauthorized or unconstitutional, but because it would be attaching too great a premium upon unconstitutional conduct in this instance.

It is, of course, true that Weeks v. United States, 1914, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, and other cases barring the use of illegally seized evidence, have been determined to rest upon constitutional grounds. Nonetheless, even as recently as Mapp v. Ohio, 1961, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, the court appears to consider that the use of the evidence is not unconstitutional per se, but that deterrence is required to negate the effect of the unconstitutional seizure. In many ways this may seem a distinction without a difference, but we think not altogether so. We have held in forfeiture cases that the illegality of a seizure, without warrant, of personalty left unattended on a public street, where knowledge of its existence, and of its illegal character or, more exactly, use, was discovered by entirely lawful means, did not sufficiently taint the government's claim. Interbartolo v. United States, 1 Cir., 1962, 303 F.2d 34.[1] It would seem to us that even if the government's unconstitutional conduct went to the heart of the apprehension, as in the case at bar, principles of deterrence should not prevent forfeiture of property the possession of which is per se contrary to public policy, as, for example, counterfeiting plates, or narcotics. Cf. United States v. Jeffers, 1951, 342 U.S. 48, 54, 72 S.Ct. 93, 96

L.Ed. 59. We do not ordinarily think of statutes specifying acts to be criminal as containing an implied proviso that no illegality exists if the discovery was unconstitutionally effected. We hold against the government in the present case not by a process of interpretation, but because under the circumstances shown it should not, and clearly should not, be permitted to assert its statutory claim.

---

1. Whether this case was correctly decided or not, it represents the general view of the circuits. See United States v. $1,058 in U. S. Currency, 3 Cir., 1963, 323 F.2d 211.