FRANK J. FARLEY, TREASURER OF THE COUNTY OF HUDSON, AND COUNTY OF HUDSON, PETITIONERS-RESPONDENTS, v. $168,400.97 AND FRANK S. TURBETT, JR., DISTRICT DIRECTOR OF INTERNAL REVENUE, AND UNITED STATES OF AMERICA, CLAIMANTS-APPELLANTS.

Argued September 8 and 9, 1969—Decided November 17, 1969.

*Mr. David M. Satz, Jr.,* United States Attorney, argued the cause for appellant United States of America (*Mr. Johnnie M. Walters,* Assistant Attorney General, *Mr. Lee A. Jackson, Mr. Crombie J. D. Garrett,* and *Mr. Bennet N. Hollander,* of the D. C. bar, attorneys).

*Mr. Isadore Glauberman* argued the cause for respondents (*Mr. Sheldon A. Weiss,* on the brief; *Mr. William F. Kelly, Jr.,* Hudson County Counsel, attorney).

The opinion of the Court was delivered by

WEINTRAUB, C. J. This action involves competing claims of the County of Hudson and of the United States to the sum of $168,400.97. The County contends the moneys were forfeited to it by their use in the gambling activities of Joseph V. Moriarty. The United States claims it holds a lien upon the moneys for taxes assessed against Moriarty.

The County brought this proceeding to establish its title to the fund. The United States removed the matter to the United States District Court which, however, remanded it to the State court. *State v. Moriarity*, 268 *F. Supp.* 546 (*N. J. D. C.* 1967). The cause was then tried, resulting in a judgment for the County. 97 *N. J. Super.* 458 (*Law. Div.* 1967). The Appellate Division affirmed, 102 *N. J. Super.* 579 (*App. Div.* 1968), and we granted the petition of the United States for certification, 53 *N. J.* 273 (1969).

For many years Moriarty was a notorious "kingpin" in the "numbers racket" in and around Jersey City. His criminal record in that field dates from the 1930s. On March 2, 1962 he was sentenced to State Prison on a guilty plea to possession of lottery slips, and he remained in the State's custody until March 12, 1964, when he was delivered to federal authorities who held him until January 6, 1965.

While Moriarty was thus in custody, a chance event occurred which ultimately led to this litigation. On July 3, 1962 some workmen, renovating private garages at 127–131 Oxford Avenue, Jersey City, discovered $2,438,110 in currency and sundry papers in an old automobile. Those papers revealed Moriarty's operation of a gambling enterprise over an extended period.[1]

This discovery precipitated activity at federal and local levels. On July 5 the District Director of Internal Revenue made a jeopardy assessment against Moriarty for income taxes and interest in the sum of $3,422,792.66. It is agreed that the federal lien became effective on that date. On the following day the local police discovered and seized the moneys involved in the action before us, under the following circumstances.

Since the papers found on July 3 related to a period which had ended sometime before the date of Moriarty's imprisonment, the police began a search for records of Moriarty's intervening operations and related cash. Moriarty having

---

[1] The moneys thus found are involved in other proceedings in the United States District Court.

selected a private garage for the cache discovered on July 3, the police thought it likely that he used still another garage to house the records and the product of that further gambling activity. This assumption proved correct, for, peering into a private garage at 56 Oxford Avenue, stipulated by the parties to be "in close proximity to the garage in which the $2,438,110 had been found on July 3, 1962," the officers saw the familiar paraphernalia of a lottery operation. Later on the same day, armed with a search warrant obtained upon that showing, they entered the garage and seized the moneys here involved, together with sundry papers revealing gambling operations from December 14, 1961 to February 19, 1962, the day before Moriarty was taken into custody. This discovery led to a further indictment of Moriarty, and later he pled guilty to possession of lottery slips for the period of December 14, 1961 to July 6, 1962, the date when the police seized the moneys here involved.

There is no dispute that the moneys were used in the gambling operation and were contraband on that account. Rather, the question is whether the tax lien attached to the moneys before title passed to the County. The United States contends the forfeiture could have occurred only when the moneys were seized by the police on July 6, which was one day after the date of the tax lien, while the County contends the forfeiture occurred at the moment the moneys were used for gambling, so that on the day of the tax assessment Moriarty had no property interest in the moneys to which the tax lien could attach. Upon this appeal the United States also urges, we think for the first time, that the Fourth Amendment bars the County's claim because the moneys were obtained by an unlawful search and seizure. We will treat the two issues in that order.

I

The Federal statute provides for "a lien in favor of the United States upon all property and rights to property,

whether real or personal, belonging" to the delinquent tax-payer, 26 *U. S. C. A.* § 6321. Whether the taxpayer has "property" or "rights to property" to which the tax lien may attach is controlled by State law. *Aquilino v. United States,* 363 *U. S.* 509, 512, 80 *S. Ct.* 1277, 4 *L. Ed.* 2d 1365, 1368 (1960). The pivotal question, then, is whether, under our State law, the moneys were the property of Moriarty on the effective date of the tax lien or had already been forfeited to the County upon their use in his gambling operation.

There were two types of forfeiture under the English practice at the time of the American Revolution. They are described by Mr. Justice Story in *The Palmyra,* 12 *Wheat.* (25 *U. S.*) 1, 14, 6 *L. Ed.* 531, 535 (1827), in these words:

"* * * It is well known, that at the common law, in many cases of felonies, the party forfeited his goods and chattels to the crown. The forfeiture did not, strictly speaking, attach in rem; but it was a part, or at least a consequence, of the judgment or conviction. It is plain from this statement that no right to the goods and chattels of the felon could be acquired by the crown by the mere commission of the offense; but the right attached only by the conviction of the offender. The necessary result was, that in every case where the crown sought to recover such goods and chattels, it was indispensable to establish its right by producing the record of the judgment of conviction. In the contemplation of the common law, the offender's right was not devested until the conviction. But this doctrine never was applied to seizures and forfeitures, created by statute, in rem, cognizable on the revenue side of the exchequer. The thing is here primarily considered as the offender, or rather the offense is attached primarily to the thing; and this, whether the offense be malum prohibitum, or malum in se. The same principle applies to proceedings in rem, on seizures in the admiralty."

In *Palmyra,* the question was whether the statutory forfeiture of the offending article depended upon a conviction of the offending person. The Court held that it did not. The Court had no occasion to say when the forfeiture did occur, but other authorities laid down some precise rules.

With respect to the so-called "common law" forfeiture, *i. e.,* the forfeiture which depended upon the owner's conviction of treason or felony, the common law held that "The

forfeiture of lands has relation to the time of the fact committed, so as to avoid all subsequent sales and encumbrances; but the forfeiture of goods and chattels has no relation backwards; so that those only which a man has at the time of the conviction shall be forfeited." IV *Blackstone, Commentaries,* *388. This view of the common law forfeiture was accepted in *United States v. Stowell,* 133 *U. S.* 1, 17, 10 *S. Ct.* 244, 247, 33 *L. Ed.* 555, 560 (1890). The doctrine of forfeiture upon conviction of treason or felony of course never obtained in our State, *N. J. S. A.* 2A:152–2, or elsewhere in this country, 36 *Am. Jur.* 2d*, Forfeiture and Penalties* § 15, *p.* 622. We nonetheless refer to it because, although the forfeiture resulted from the commission of an offense rather than the misuse of the property forfeited, still the common law found that title to real property was forfeited as of the time of the criminal act rather than as of the date of conviction. The rule was otherwise as to personal property because of the practical considerations stated by Blackstone, at the reference just given:

"Therefore a traitor or felon may *bona fide* sell any of his chattels real or personal, for the sustenance of himself and family between the fact and conviction; for personal property is of so fluctuating a nature, that it passes through many hands in a short time; and no buyer could be safe, if he were liable to return the goods which he had fairly bought, provided any of the prior vendors have committed a treason or felony."

But as to the so-called "statutory" forfeiture, *i. e.,* the forfeiture of the very property used in violation of the law, the rule has been constant, whether the offending property be real or personal, that title may be forfeited as of the moment of the offending use. Unlike the "common law" forfeiture which embraced all of the individual's property and resulted from the individual's personal offense, the "statutory" forfeiture is limited to the offending property itself, "which is proceeded against, and, by resort to a legal fiction, held guilty and condemned as though it were conscious instead of

inanimate and insentient." *Various Items of Personal Property, etc. v. United States*, 282 U. S. 577, 581, 51 S. Ct. 282, 75 L. Ed. 558, 561 (1931).[2]

Thus in *United States v. 1960 Bags of Coffee*, 8 Cranch (12 U. S.) 398, 3 L. Ed. 602 (1814), which involved a statute forbidding the importation of certain articles, it was held that the statutory forfeiture occurred at once and therefore the title of the government was not cut off by a sale of the commodity to an innocent buyer. So in *United States v. One Hundred Barrels Distilled Spirits*, 81 U. S. (14 Wall.) 44, 20 L. Ed. 815 (1872), in which the forfeiture ensued because liquor was moved with intent to defraud the United States of taxes, it was held that title vested immediately in the United States when the liquor was so moved and that the subsequent payment of the tax did not vacate the forfeiture, even though the property had been sold to an innocent buyer. The Court stated the rule in these words (81 U. S., at 56–57, 20 L. Ed., at 816–817):

"Where the forfeiture is made absolute by statute the decree of condemnation when entered relates back to the time of the commission of the wrongful acts, and takes date from the wrongful acts and not from the date of the sentence or decree. * * * Many such adjudged cases are to be found in the reported decisions of this court, and it must be admitted that they establish the rule beyond all doubt, *that the forfeiture becomes absolute at the commission of the prohibited acts, and that the title from that moment vests in the United States in all cases where the statute in terms denounces the forfeiture of the property as a penalty for a violation of law, without giving any alternative remedy, or prescribing any substitute for the forfeiture, or allowing any exceptions to its enforcement, or employing in the enactment any language showing a different intent;* and that in all such cases it is not in the power of the offender or former owner to defeat the forfeiture by any subsequent transfer of the property,

---

[2] In rejecting the contention that substantive due process prevented the forfeiture of innocent interests in property used illegally, the Supreme Court found some analogy to the ancient doctrine of *deodand* by which a personal chattel which was the immediate cause of the death of a human was forfeited. *J. W. Goldsmith, Jr.–Grant Co. v. United States*, 254 U. S. 505, 511, 41 S. Ct. 189, 65 L. Ed. 376, 379 (1921).

even to a bona fide purchaser for value, without notice of the wrongful acts done and committed by the former owner." (Emphasis added.)

The authorities just cited speak in terms of the relation-back of the judgment to the time of the forfeiting act. This does not mean that the State's title is merely "inchoate" up to the time of a judicial judgment within the meaning of decisions which found that certain liens authorized by State law depended for their substance upon later events and therefore were inferior to an intervening federal tax lien even though under State law the liens were fully effective as of their original filing dates. See *United States v. Security Trust & Savings Bank of San Diego,* 340 *U. S.* 47, 71 *S. Ct.* 111, 95 *L. Ed.* 53 (1950) ; *United States v. Acri,* 348 *U. S.* 211, 75 *S. Ct.* 239, 99 *L. Ed.* 264 (1955) ; *United States v. Pioneer American Ins. Co.,* 374 *U. S.* 84, 83 *S. Ct.* 1651, 10 *L. Ed. 2d* 770 (1963) ; *United States v. Equitable Life Assurance Society,* 384 *U. S.* 323, 86 *S. Ct.* 1561, 16 *L. Ed. 2d* 593 (1966). On the contrary, the proposition in the excerpt quoted above from *One Hundred Barrels Distilled Spirits* is unequivocal that "the forfeiture becomes absolute at the commission of the prohibited acts and that the title from that moment vests in the United States * * *." The earlier statement in the same excerpt that "the decree of condemnation when entered relates back to the time of the commission of the wrongful acts and not from the date of the sentence or decree," means only that the decree adjudges and confirms that title passed when the wrongful act was done.

This thesis clearly appears in the opinion of Chief Justice Marshall in *United States v. Grundy,* 3 *Cranch* (7 *U. S.*) 337, 351, 2 *L. Ed.* 459 (1806). After stating that (3 *Cranch,* at 350–351, 2 *L. Ed.,* at 463) :

"Where a forfeiture is given by a statute, the rules of the common law may be dispensed with, and the thing forfeited may either vest immediately, or on the performance of some particular act, as shall be the will of the legislature. This must depend upon the construction of the statute."

the Chief Justice said (3 *Cranch,* at 352–353, 2 *L. Ed.,* at 464) :

> "If the property in the vessel was actually vested in the United States by the commission of the offense, then the judgment of a court, condemning the vessel, or declaring it to belong to the government, would, in fact, do nothing more than ascertain that the offense had been committed ; it would not vest the thing more completely in the government, in point of right, than it was vested by the commission of the offense."

That title may pass at once upon the commission of the offending act was reiterated in *United States v. Stowell, supra,* 133 *U. S.* 1, 10 *S. Ct.* 244, 33 *L. Ed.* 555, and *Texas v. Donoghue,* 302 *U. S.* 284, 58 *S. Ct.* 192, 82 *L. Ed.* 264 (1937).

In short, then, when a statute provides for a forfeiture, the forfeiture takes place upon the occurrence of the forbidden act or omission unless the statute provides otherwise, and the sovereign's title is in no sense inchoate because procedural due process requires an opportunity to dispute the claim of forfeiture in a judicial proceeding. The judgment in such a proceeding simply resolves a title contest, as it does in other settings, as when the situs of ownership depends upon the construction of a will or a deed, or upon a relationship to a deceased, or upon adverse possession. The judgment which settles the dispute does not initiate the title; it serves only to confirm the title by dissipating claims against it.

As we understand the argument before us, the United States agrees that property may be forfeited immediately upon its offensive use and thereupon nothing remains to which the federal tax lien may attach even though the tax is assessed prior to a judgment verifying the fact of forfeiture. Rather, the United States says our Legislature intended the forfeiture should not occur until the property is actually seized. Upon this premise, the United States contends that, prior to seizure, the State's right (*i. e.,* to seize the property and thereby

accomplish the forfeiture) was merely "inchoate" within the concept underlying the competing lien claim cases cited above. The United States urges that if *Spagnuolo v. Bonnet,* 16 *N. J.* 546 (1954), is read to hold that title vests at the time of the gambling use, it should be rejected. We read *Spagnuolo* so to hold and find upon a review of the subject that *Spagnuolo* correctly took that view.

The forfeiture of things used in gambling derives from *L.* 1878, *c.* 78, *p.* 137, which provided that:

"Whenever any furniture or implements made or used for the playing of the game of faro, roulette, rouge et noir, or any unlawful game, shall be seized or captured by the police, constabulary or other officers in this state, it shall be the duty of the prosecutor of the pleas in the county where such seizure is made, to have the same destroyed or rendered useless for the uses and purposes aforesaid, and it shall be unlawful to return the same to the person or persons owning the same, or to any person whatsoever."

That statute is now *N. J. S. A.* 2A:152–6[3]. It did not expressly say the offending article was forfeited but the fact of forfeiture was of course implicit in its terms.

In *Kenny v. Wachenfeld,* 14 *N. J. Misc.* 322, 184 *A.* 737 (*Sup. Ct.* 1936), the plaintiff sought to replevin cash bet with him as a bookmaker. In denying recovery, the former Supreme Court said (*p.* 323) :

"It seems clear that since the money was earmarked and segregated, as part of a gambling operation, it could be as well seized as a gambling device. Because of the use, the money became contraband and the appellant [plaintiff] may not receive possession thereof."

Although the 1878 statute we have just quoted was not mentioned, it is plain that the court had its provisions in mind.

By *L.* 1941, *c.* 70, *p.* 156, the Legislature added provisions which now appear as *N. J. S. A.* 2A:152–7 through 11. The 1941 statute did not supersede the 1878 act. Rather, accept-

---

[3] Additional provisions added by amendment in 1951 do not aid the present inquiry and therefore need not be mentioned.

ing and confirming the view that the 1878 statute forfeited moneys used in gambling, the Legislature by the 1941 act resolved the question whether the forfeited moneys belonged to the State or the county,[4] and decided the contraband should be the county's, no doubt because the county bears the dollar brunt of criminal prosecutions, see *State v. Rush,* 46 *N. J.* 399, 21 *A. L. R. 3d* 804 (1966). The 1941 statute also provided a simplified procedure for the determination of claims to the moneys. Nothing in that measure suggests the further purpose of delaying the forfeiture until the moneys are actually seized.

The first section of the 1941 statute, *N. J. S. A.* 2A:152–7, reads:

"Whenever any money, currency or cash shall be seized or captured by the police, constabulary or other officer *in connection with any arrest* for violation of or conspiracy to violate any gambling law of this state, the said money, currency or cash *shall be deemed prima facie to be contraband of law* as a gambling device, or as part of a gambling operation, and it shall be unlawful to return the said money, currency or cash to the person or persons claiming to own the same, or to any other person, except in the circumstances and manner hereinafter provided." (Emphasis added.)

It will be noted that the section speaks of moneys seized or captured "in connection with any arrest" for a gambling violation. In *State v. Link,* 14 *N. J.* 446 (1954), the gambling moneys were taken from a wall safe in Link's home pursuant to a search warrant. Link had been arrested on an earlier date. It was urged that the moneys were not the property of the county because they were not seized "in

---

[4] The title of the statute states expressly that it is a supplement. The statement of purpose annexed to the 1941 bill reads:

"Funds seized by law enforcement officials in gambling and gaming raids and arrests are customarily surrendered to the county treasurer. This act would provide a method to justly and lawfully dispose of such funds after the termination of the cases in which the seizure of said funds were involved, thus eliminating the present doubts, now existing, respecting the right to apply such funds to the use of the county, or to return such funds to the rightful owner, as the case may be."

connection with any arrest." The Court rejected that position. It found that the phrase "in connection with any arrest" did not require the seizure to coincide with the arrest and hence the prior arrest of Link satisfied that statutory language. The underlying thesis was that the 1941 statute did not create the forfeiture, but rather fashioned a procedure for litigating claims over the fund. The opinion closed with the observation that "if the money was contraband when it was seized, it still remained contraband despite the failure to arrest at the precise time the currency was impounded. Its legal status was not changed by such an omission." (14 *N. J.*, at 454).

■■ Thus the 1941 statute formulated a procedure for resolving the claims to moneys and endeavored by its first section, quoted above, to establish an incidental rule of evidence that whatever moneys are seized "in connection with an arrest * * * shall be deemed *prima facie* to be contraband of law as a gambling device." But in providing for a procedure and the incidental rule of evidence, the Legislature did not intend thereby to limit the substantive reach of the 1878 statute to situations in which the gambling moneys are seized at the time of arrest or in connection with the arrest. Indeed, the 1941 statute was not intended to prescribe an exclusive procedure even with respect to articles seized at the time of arrest, and hence it was held in *Farley v. Manning*, 4 *N. J.* 571 (1950), that the title dispute could be resolved in an interpleader action.[5]

This brings us to *Spagnuolo v. Bonnet, supra*, 16 *N. J.* 546, which the United States seeks to distinguish. There the gambling moneys were in fact seized prior to the jeopardy tax assessment by the federal government and hence the case did not turn upon whether the forfeiture occurred before or at

---

[5] We note that a forfeiture statute need not provide for procedural due process. In this State, the judiciary itself has the constitutional power to provide for the demand of procedural due process, whatever they may be. *State v. American-Hawaiian Steamship Co.*, 29 *N. J. Super.* 116, 128–129 (*Ch. Div.* 1953).

the time of seizure. Rather the United States contended "that the County of Essex had nothing more than an inchoate lien or potential contingent property right in the money until the order of forfeiture * * *; that at most any right of the county to the money was purely contingent at least until * * * the date of Spagnuolo's conviction." (16 N. J., at 556.) The Court rejected both propositions and held for the County.

The seizure having antedated the federal tax assessment, the County apparently referred to the date of seizure in the course of its argument that the forfeiture did not depend upon the judgment. The opinion refers several times to the seizure, doubtless because of the manner of argument. But the ultimate thesis was that the moneys were forfeited at the time of their use in gambling. After noting that the forfeiture was directed by the 1878 act (*p.* 556), and that the 1941 statute was simply a supplement which did not restrict the reach of that measure (*pp.* 557–559), *Spagnuolo* said (*pp.* 559–560):

"The trial court, on the proofs offered, declared the money to be contraband and entered the confirming judgment of forfeiture under the statute. He had no other alternative. Where a forfeiture is absolute under the statute, as it is here, the judgment of condemnation or forfeiture when entered relates back to the commission of the wrongful act and takes date from the wrongful acts, not from the date of sentence or decree. *United States v. 1960 Bags of Coffee*, 8 *Cranch* 398, 3 *L. Ed.* 602 (1814) ; *In re Henderson's Distilled Spirits*, 14 *Wall.* 44, 81 *U. S.* 44, 20 *L. Ed.* 815 (1872) ; *United States v. Pacific Finance Corp.*, 110 *F.* 2d 732 (2d *Cir.* 1940), and the cases cited therein. *Cf. Motlow v. State of Missouri*, 295 *U. S.* 97, 55 *S. Ct.* 661, 79 *L. Ed.* 1327 (1935) ; 51 *Harv. L. Rev.* 1112.

The established rule is that the forfeiture becomes absolute at the commission of the prohibited acts and the title from that moment vests in the state or government in all cases where the statute in terms denounces the forfeiture of the property as a penalty for a violation of the law, without giving any alternative remedy or providing any substitutes for forfeiture or allowing any exceptions to its enforcement, and that in all such cases it is not in the power of the offender or the former owner to defeat the forfeiture by any subsequent transfer of the property, even as to a *bona fide* purchaser for value, without notice of the wrongful acts done or committed by the former owner. The

forfeiture is considered as directed against the thing itself, not merely the possessor's interest in it. *In re Henderson's Distilled Spirits, supra*."

Thus *Spagnuolo* concluded that the forfeiture occurred at the time the moneys were wrongfully used, and this because the Legislature did not express a purpose to delay it. We add that the reference in the excerpt from *Spagnuolo* to the concept of relation-back of the judgment meant only, as we have already said, that the judgment, in the words of the same excerpt, is the "confirming" judgment of forfeiture.

 Thus the rationale of *Spagnuolo* repels the proposition urged upon us here, that the Legislature intended the forfeiture to occur only upon seizure. Nor did *Spagnuolo* err in that regard. That the 1878 statute referred to a seizure does not suggest the forfeiture was to await that event. The statute was couched as a mandate upon the prosecutor with respect to the disposition of property seized and hence understandably referred to the seizure as the event which triggerd the prosecutor's duty. The forfeiture itself was implicit in the statute, as we have already said.

We see no reason why the Legislature would want to delay the forfeiture until seizure or to make the forfeiture depend upon it. That construction was rejected in similar cases. So *United States v. Stowell, supra*, 133 *U. S.*, at 17, 10 *S. Ct.*, at 247, 33 *L. Ed.*, at 560, held the statute's use with reference to offending articles of the phrases "wherever found" and "found in the distillery," did not express an intent to delay the forfeiture to the time when the articles were found. Again, *United States v. Pacific Finance Corp.*, 110 *F. 2d* 732 (2 Cir. 1940), held a statutory mandate that vehicles used for smuggling "shall be seized and forfeited" did not negate an intent to forfeit the vessel at the time of its illegal use. To the same effect is *United States v. One 6.5 MM. Mannlicher-Carcano Military Rifle, etc.*, 250 *F. Supp.* 410 (*N. D. Tex.* 1966). But see *Stout v. Green*, 131 *F. 2d* 995 (9 Cir. 1942).

It is true, of course, that forfeited property, if not seized, may never reach the hands of the condemning sovereign.

That is equally true of the federal tax lien which may touch things of which the United States may never learn. But that is no reason to assume that either legislature intended the sovereign's interest to arise only when the property is actually in its grasp.

## II

██ The second point the United States advances is that the moneys were obtained by an illegal search and seizure and for that reason the Fourth Amendment bars their retention by the County.

The issue is not before us. It was not raised in the trial court or on appeal to the Appellate Division, or for that matter in the brief filed with us. The legality of the seizure was questioned only in connection with the unsound claim that the word "seized" in the State forfeiture statute (*N. J. S. A.* 2A:152-6) means "lawfully" seized and hence the statute does not forfeit contraband if its seizure is illegal.

It would be unfair to the County to accept the Fourth Amendment issue at this stage. There was in fact a search warrant and the supporting affidavit revealed an adequate basis for it. The United States refers to some testimony later given by the officer as to how he peered into the garage, and it argues that an illegal "entry" into the garage thereby occurred. But the total facts were not developed, and understandably so since the sole point being pressed, *i. e.,* that our Legislature conditioned the forfeiture upon the legality of the seizure of the property, was untenable as a matter of law. We will not at this late hour permit an attack which was not in view when the record was made.

We add nonetheless that if the challenge were accepted it would fail even if we assumed the search and seizure somehow invaded Moriarty's Fourth Amendment right and assumed also, for the moment, that the federal doctrine barring the use as evidence of things illegally seized would also bar the sovereign's title to contraband so seized.

The cases presently hold that evidence illegally seized will be suppressed only upon the complaint of one whose rights were violated by the search. See *Alderman v. United States*, 394 *U. S.* 165, 171–175, 89 *S. Ct.* 961, 965–967, 22 *L. Ed. 2d* 176, 185–187 (1969); *United States v. One 1963 Cadillac Coupe de Ville Two-Door*, 250 *F. Supp.* 183 (W. D. Mo. 1966); *United States v. One 1953 Model Mercury Sedan Auto*, 149 *F. Supp.* 657 (S. D. Ala. 1957); *United States v. One 1952 Ford Victoria*, 114 *F. Supp.* 458 (N. D. Cal. 1953); *State v. One 1960 Mercury Station Wagon*, 5 *Conn. Cir.* 1, 240 *A. 2d* 99 (Cir. Ct. App. Div. 1968).

██ The United States does not have the required standing. The Fourth Amendment protects the privacy of people from intrusion by the federal government. It would be hard to find that the United States is itself the intended beneficiary of a constitutional provision intended to restrain it, or that the United States is a person within the meaning of a provision designed to establish a right of privacy. And if the United States could claim the cover of the Fourth Amendment, still it had no right of privacy in Moriarty's garage. Nor, if we are correct in our conclusion under Point I, did the United States have any interest in the moneys themselves since they were the County's when the federal tax lien was sought to be levied. Nor could it be said that Moriarty held the moneys consensually for the United States. He was an antagonist of both the United States and the State of New Jersey. Both pursued him, and the Fourth Amendment stood between them and him. For all of those reasons the United States could hardly maintain its constitutional rights were insulted when the police officer looked into Moriarty's garage or entered it under the search warrant.

█ Still further, if somehow it had standing to question the seizure of the moneys and if the seizure were illegal, the United States could not prevail on its ultimate claim that a violation of the Fourth Amendment will deprive the County

of its title to the moneys. At the oral argument before us the United States for the first time urged that *One 1958 Plymouth Sedan v. Pennsylvania,* 380 *U. S.* 693, 85 *S. Ct.* 1246, 14 *L. Ed.* 2d 170 (1965), held that contraband may not be retained if the sovereign obtained possession by a seizure violating the Fourth Amendment. That was not the law before *One 1958 Plymouth Sedan.* See *United States v. Jeffers,* 342 *U. S.* 48, 72 *S. Ct.* 93, 96 *L. Ed.* 59, 65 (1951); *Trupiano v. United States,* 334 *U. S.* 699, 68 *S. Ct.* 1229, 92 *L. Ed.* 1663, 1672 (1947); *United States v. Eight Boxes, etc.,* 105 *F.* 2d 896 (2 *Cir.* 1939); *United States v. $1,058 in United States Currency,* 323 *F.* 2d 211 (3 *Cir.* 1963); *United States v. One 1956 Ford Tudor Sedan,* 253 *F.* 2d 725 (4 *Cir.* 1958); *Sanders v. United States,* 201 *F.* 2d 158 (5 *Cir.* 1953); *Grogan v. United States,* 261 *F.* 2d 86 (5 *Cir.* 1963); *United States v. One Bally "Barrel-O-Fun" Coin-operated Gaming Device,* 224 *F.* Supp. 794 (M. D. Pa. 1963); *United States v. Pacific Finance Corp.,* 110 *F.* 2d 732, 733 (2 *Cir.* 1940). But *cf., Berkowitz v. United States,* 340 *F.* 2d 168, 8 *A. L. R.* 3d 463 (1 *Cir.* 1965). See Annotation, 8 *A. L. R.* 3d 473, 475 (1966). And we do not believe that *One 1958 Plymouth Sedan* holds the other way.

We heretofore read *One 1958 Plymouth Sedan* to hold only that evidence illegally seized could not be used in a forfeiture proceeding against the victim of the search, rather than to say that the State must return contraband to the culprit even though the fact of contraband is shown by other admissible evidence. *State v. Sherry,* 46 *N. J.* 172, 178 (1965). Doubt having since been expressed as to whether *One 1958 Plymouth Sedan* should be so read, see *John Bacall Imports, Ltd. v. United States,* 287 *F.* Supp. 916, 924 (C. D. Cal. 1968), and annotation cited above, 8 *A. L. R.* 3d, at 474, we add a further statement in support of our interpretation of that case.

If in *One 1958 Plymouth Sedan* the Court meant that the illegal seizure of the automobile operated to prevent or undo

the forfeiture, a simple statement to that effect would have disposed of the matter. Neither the issue nor the result was stated in such terms. The issue was clearly said to be whether the illegally seized contents of the vehicle could be used to prove that the vehicle had been improperly employed and hence forfeited. Thus the Court said (380 *U. S.,* at 698, 85 *S. Ct.,* at 14 *L. Ed. 2d,* at 173–174) :

"In both the *Boyd* [Boyd v. United States, 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746] situation and here the essential question is whether evidence — in *Boyd* the books and records, here the results of the search of the car — the obtaining of which violates the Fourth Amendment may be relied upon to sustain a forfeiture. *Boyd* holds that it may not."

The Court then discussed *United States v. Jeffers, supra,* 342 *U. S.* 48, 72 *S. Ct.* 95, 96 *L. Ed.* 59, and *Trupiano v. United States, supra,* 334 *U. S.* 699, 68 *S. Ct.* 1229, 92 *L. Ed.* 1663. Presumably the government argued that under those cases illegally seized evidence, although not usable to obtain a conviction for crime, need not be returned to the defendant if it is contraband. The Court agreed that *Jeffers* and *Trupiano* so held, and without in anywise questioning the correctness of that holding, the Court pointed out that in those cases the articles were contraband on their face, so that the fact of contraband did not depend upon the use of illegally seized evidence. Far from saying that a forfeited article which is not *per se* contraband must be returned because it was illegally seized even though the forfeiture can be shown by other untainted proof, the Court expressly pointed out that Pennsylvania had no other evidence to show the illegal use of the vehicle. Thus, the opinion reads (380 *U. S.,* at 699, 85 *S. Ct.,* at 14 *L. Ed. 2d,* at 174) :

"It is apparent that the nature of the property here, though termed contraband by Pennsylvania, is quite different. There is nothing even remotely criminal in possessing an automobile. It is only the alleged use to which this particular automobile was put that subjects Mr. McGonigle to its possible loss. And it is conceded here that the Commonwealth could not establish an illegal use without using the evidence resulting from the search which is challenged as having been in violation of the Constitution."

Hence we remain of the view that *One 1958 Plymouth Sedan* does not hold that a State or the United States is deprived of property which was forfeited to it if it acquired possession of that property by a search and seizure proscribed by the Fourth Amendment.

Nor will we on our own adopt the rule urged upon us. The Fourth Amendment does not call for the suppression or return of things obtained in violation of its terms. The exclusionary rule was judge-made, upon the belief that no other sanction could deter insolence in office. A majority of the States, including our own, were not persuaded to adopt that rule, *Eleuteri v. Richman*, 26 *N. J.* 506, 511 (1958). Doubts remain as to its wisdom. *State v. Gerardo*, 53 *N. J.* 261 (1969). We see no reason to go beyond that rule and to forfeit what is the State's property because of the manner whereby it obtained possession.

Such a doctrine would redound equally against the United States, for if an illegal search should bar a State from asserting its title, it should as well bar the United States from asserting its tax lien whenever the subject property is revealed by an infraction of the Constitution. And with the demise of the "silver platter" doctrine, *Elkins v. United States*, 364 *U. S.* 206, 80 *S. Ct.* 1437, 4 *L. Ed. 2d* 1669 (1960), both sovereigns would be barred no matter whose constabulary unlawfully unearthed the fund. We can see no value in that result. The beneficiary would be the guilty, and primarily parties to organized crime, who even now are too well insulated by current constitutional concepts. And so, here, the thesis the United States presses upon us would also defeat its claim to those moneys. The winner would be Mr. Moriarty.

The judgment is affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—6.

*For reversal*—NONE.