**STATE OF NEW JERSEY, Plaintiff,**

v.

**Harry Joseph KAISER and Susan Kaiser, Defendants,**

v.

**UNITED STATES of America, Intervenor.**

**Civ. No. 496–63.**

United States District Court,
D. New Jersey.

Oct. 15, 1971.

Nelson G. Gross, Hackensack, N. J., for plaintiff.

Herbert J. Stern, U. S. Atty. by Alfred C. De Cotiis, Asst. U. S. Atty., Newark, N. J., for defendants.

## OPINION

SHAW, District Judge.

The Government asserts a lien against money seized in a gambling raid made by New Jersey State Police on July 14, 1960, on premises known as 53 Forrest Place, North Arlington, New Jersey. It is contended by the County of Bergen

that the cash found on the premises and seized by the police was contraband and that the Government is not entitled to any part thereof in satisfaction of its lien for income tax. At the time of the raid the premises were occupied by Harry Kaiser, Susan Kaiser and Edna Kaiser. Susan Kaiser (now deceased) claims that $6,000 of the money found on the premises had not been used for gambling purposes and was her own personal property and, therefore, not contraband. Since she has demanded trial by jury, her claim (now prosecuted by her personal representative) has been severed and will be dealt with separately.

The issue presented for disposition now is whether the Government lien for income taxes became effective before the cash became contraband and subject to forfeiture to the State. It is contended by the Government that $265,000 of the cash seized was in a locked vault and was the property of Joseph Moriarity, a notorious gambler.

On August 12, 1947, a tax delinquency in the amount of $81,356.10 was assessed against Moriarity. On August 26, 1947, there was demand for payment of the assessment. On March 8, 1955, judgment was obtained in favor of the United States against Moriarity for $161,139.72, plus costs. The raid occurred on July 14, 1960, at which time the Kaisers were arrested and $275,841.85 was seized and delivered to the Bergen County Treasurer. The Kaisers were indicted and convicted of gambling operations on the premises and the convictions were affirmed by the Appellate Division of the Superior Court of New Jersey. State v. Kaiser, 74 N. J.Super. 257, 181 A.2d 184 (App.Div. 1962). A petition for certification to the New Jersey Supreme Court was denied on September 17, 1962.

An evidentiary hearing was conducted to determine whether Moriarity had property rights in the funds seized when the federal liens came into existence. The pertinent facts adduced at hearing can be briefly summarized as follows:

A search warrant was executed by the New Jersey State Police on July 14, 1960, at 53 Forrest Place, North Arlington, New Jersey. Betting slips and other gambling paraphernalia were found on the first floor of the premises together with a substantial amount of cash. There were two bedrooms on the second floor and one was searched. The search of a chest of drawers produced bundles of $1 bills and bundles of $100 bills, the total amount found being $3,650. A fireproof steel chest was observed in this bedroom. It was 13″ wide, 6½″ long and 9″ in depth and was locked. It was pried open by the police and found to be packed full of cash amounting to $265,000. There is evidence which permits the inference that Joseph Moriarity occupied this bedroom at one time. Prescription bottles issued to Moriarity were found in a desk drawer and items of personal property found in the bedroom support such inference. Subsequent to the raid it was discovered that Moriarity had two keys which would open the lock of the vault. There was a long and continuous record of convictions of Moriarity for gambling going back to 1935. Officer Frank P. Kolodzieski of the New Jersey State Police testified that he had three sheets of records of such convictions with seven convictions listed on each sheet. This officer, who qualified for expert testimony on gambling operations, stated that it was his opinion that the $265,000 found in the vault or steel box was part of a gambling operation. There is evidence that the betting slips found on the first floor indicated approximately $12,000 in receipts for the day.

Joseph Toscano, an agent of the Internal Revenue Service, Intelligence Division, with extensive experience in gambling operations and investigations, stated that mere calculations of lottery slips found at a given time on a particular day would not furnish a basis for an accurate conclusion as to the size of the gambling business conducted over a period of time. He characterized the premises as " . . . the counting house

where the slips wind up and the winners are determined and certain bookkeeping takes place with regard to the correct amounts that different people are reporting and any mistakes that are encountered in the numbers, and different things that take place in this business, the counting house where the slips go daily."

This witness further testified that it is not general practice for those engaged in illegal gambling operations to utilize banks for deposit of money or to keep commercial records of transactions. He expressed the opinion that the money found in the box was money that Moriarity was stashing away for the time when he was going to get out of the gambling business. He further identified Moriarity as a man who had been conducting illegal gambling operations from as early as 1930.

The question of fact to be resolved is whether the $265,000 found in the box was money which had been accumulated by Moriarity from his gambling operations which pre-dated the Government lien. There is evidence that Moriarity also conducted a news business, but the evidence as to his profits from his newsboy activities is not entirely credible. On the other hand, his long record of operations in illegal gambling has not been refuted. The summary of his career as set forth by the New Jersey Supreme Court in Farley v. $168,400.97, 55 N.J. 31, 259 A.2d 201 (1969), was corroborated at the evidentiary hearing by Officer Kolodzieski and by Treasury Agent Toscano produced by the Government. In writing the opinion for the New Jersey Supreme Court in Farley v. $168,400.97, *supra*, Chief Justice Weintraub stated:

For many years Moriarty was a notorious "kingpin" in the "numbers racket" in and around Jersey City. His criminal record in that field dates from the 1930s. On March 2, 1962 he was sentenced to State Prison on a guilty plea to possession of lottery slips, and he remained in the State's custody until March 12, 1964, when he

was delivered to federal authorities who held him until January 6, 1965. While Moriarty was thus in custody, a chance event occurred which ultimately led to this litigation. On July 3, 1962 some workmen, renovating private garages at 127–131 Oxford Avenue, Jersey City, discovered $2,438,110 in currency and sundry papers in an old automobile. Those papers revealed Moriarty's operation of a gambling enterprise over an extended period. (259 A.2d 201 at 202).

There is no doubt that the premises at 53 Forrest Place, North Arlington, occupied by the Kaisers at the time of the raid was the situs of a substantial gambling business. The nature of that business and the gambling paraphernalia found at the time of the raid indicated that the business had been in operation for a considerable period of time. The evidence also permits as the more reasonable inference that Moriarity had at one time occupied the bedroom on the second floor and had access to the strong box in which $265,000 in cash was stashed away. The Kaisers had access to this bedroom and the strong box, weighing from 20 to 25 pounds, was in their possession and under their control. The fact that the Kaisers did not produce a key to open it does not eliminate the likelihood that they did have access to it or could have gained access to it. Two keys were found in the possession of Moriarity, but they were keys which could be duplicated. It is also significant that a substantial amount of cash was also found in this bedroom in a chest of drawers to which the Kaisers had ready access.

The operation of 26 U.S.C. §§ 6321, 6322, which creates a federal tax lien, and 26 U.S.C. § 7403, which provides for a civil action to enforce a lien, are dependent upon state law concerning whether the taxpayer had "property" or "rights to property" in a fund which can be reached by federal authority. Aquilino v. United States, 363 U.S. 509, 512–513, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960). Under state law N.J.S.A.

2A:152–7 it is provided that whatever currency is seized in connection with any arrest for violation of or conspiracy to violate any gambling laws, the currency shall be deemed *prima facie* to be contraband of law as part of a gambling operation.[1] A presumption is, therefore, created which, unless rebutted, will prevail. Farley v. $168,400.97, *supra.*

█ In this case the seizure occurred subsequent to the time when the Government's lien was perfected by judgment, but the forfeiture to the State does not depend upon the time of the arrest and the seizure. The forfeiture occurs as of the time the property becomes contraband by virtue of its illegal use. In Farley v. $168,400.97, supra, it was stated:

> In short, then, when a statute provides for a forfeiture, the forfeiture takes place upon the occurrence of the forbidden act or omission unless the statute provides otherwise, and the sovereign's title is in no sense inchoate because procedural due process requires an opportunity to dispute the claim of forfeiture in a judicial proceeding. The judgment in such a proceeding simply resolves a title contest, as it does in other settings, as when the situs of ownership depends upon the construction of a will or a deed, or upon a relationship to a deceased, or upon adverse possession. The judgment which settles the dispute does not initiate the title; it serves only to confirm the title by dissipating claims against it. (259 A.2d 201 at 206).

█ The Court finds from the evidence that the $265,000 found in the strong box was accumulated by Moriarity or by him and the Kaisers jointly as a result of illegal gambling operations and that as of the time the lien of the Government came into existence neither Moriarity nor the Kaisers had any "property" or "rights to property" in the money. The forfeiture occurred at a time and by virtue of the fact that it represented the fruits of an illegal gambling operation. It is the opinion of the Court that this money as well as the other vast sums accumulated by Moriarity could not be attributed to proceeds from the operation of a newsstand. All evidence points to the contrary inference, namely, that it was accumulated out of illegal gambling operations. Moreover, considering the fact that the Kaisers had a substantial degree of control over this small strong box, it cannot be said without equivocation that the money was not the product of a joint gambling enterprise although the money may have represented Moriarity's share. The fact that the $265,000 may not have been used in the daily operation and financing of the gambling business being conducted in the Kaiser residence would in no way affect the presumption that the money was the proceeds of a gambling operation. The testimony of Agent Toscano, a Treasury agent well trained in illicit gambling operations and with extensive investigative experience, has, when considered with the other evidence, very cogent force in leading to the conclusion that the $265,000 represented the proceeds of illegal gambling. He stated in answer to a hypothetical question predicated upon all of the evidence:

> —I would say it would be my assumption from these facts, as you have outlined them, that this locked box would be money that Moriarity was stashing away for some day when he was going to get away from this

1. N.J.S.A. 2A:152–7. *Money seized on arrest for playing unlawful games; return prohibited; exceptions*
Whenever any money, currency or cash shall be seized or captured by the police, constabulary or other officer in connection with any arrest for violation of or conspiracy to violate any gambling law of this state, the said money, currency or cash shall be deemed prima facie to be contraband of law as a gambling device, or as part of a gambling operation, and it shall be unlawful to return the said money, currency or cash to the person or persons claiming to own the same, or to any other person, except in the circumstances and manner hereinafter provided.

**46**

business and go out and live the rest of his life in peace and contentment.

The attempt of the Government to establish that this money was in Moriarity's possession before he engaged in the business of illegal gambling or that he accumulated it from his newsstand business lacks the probative force to rebut the presumption of contraband. In Spagnuolo v. Bonnet, 16 N.J. 546, 109 A.2d 623 (1954), the New Jersey Supreme Court stated:

> The established rule is that the forfeiture becomes absolute at the commission of the prohibited acts and the title from that moment vests in the state or government in all cases where the statute in terms denounces the forfeiture of the property as a penalty for a violation of the law, without giving any alternative remedy or providing any substitutes for forfeiture or allowing any exceptions to its enforcement, and that in all such cases it is not in the power of the offender or the former owner to defeat the forfeiture by any subsequent transfer of the property, even as to a *bona fide* purchaser for value, without notice of the wrongful acts done or committed by the former owner. The forfeiture is considered as directed against the thing itself, not merely the possessor's interest in it. In re Henderson's Distilled Spirits, supra, [14 Wall. 44, 81 U.S. 44, 20 L.Ed. 815].

Therefore, we must conclude that at the time the jeopardy assessment was attempted to be levied against the particular monies in this case, seized under the circumstances in which they were, title to the property was then in the County of Essex. At most the federal lien could only attach to Edward Spagnuolo's inchoate right to sue for the return of the funds in the event of his acquittal and not to the confiscated funds themselves. The federal lien can rise no higher than the rights of the taxpayer. Id. 630–631.

■ The fact that at some point in time money is no longer used in a gam-

bling operation does not divest the State of an interest which it has. There may, of course, be situations where the money is placed in the stream of commerce and finds its way into the hands of a *bona fide* purchaser which would invite equitable considerations in the matter of title, but such a situation is not presented here.

■ The final argument of the Government is that it has standing to urge that the money seized was the fruit of an unlawful search. This Court disagrees. The Government has no standing to raise the issue of an illegal search and seizure. As to this aspect of the matter, this Court finds the reasoning of the New Jersey Supreme Court in Farley v. $168,400.97, *supra*, where the same contention was made, sound and applicable to the present case.

Judgment will be entered in favor of the State and against the United States with prejudice and without costs.

An appropriate order for entry of judgment may be submitted.