JOHN BACALL IMPORTS, LTD., a California corporation, Plaintiff,

v.

UNITED STATES of America; Lester D. Johnson, Commissioner of Customs; Frank R. Creed, Regional Commissioner, Region VII; William R. Knoke, District Director of Customs; Oscar W. Polcuch, Customs Agent in Charge; John A. Dresser, Staff Officer, Customs Agency, Region V; Melvin C. Johnson, Supervising Customs Agent, Headquarters, Region V, Defendants.

UNITED STATES of America, Plaintiff,

v.

42 WOODEN SHIPPING BOXES OF TEXTILE FABRICS
2 Cardboard Cartons of Textile Fabrics
8 Boxes of Miscellaneous Pieces Fabrics
2 Drums Trash
5,322 Rolls & "Boards" of Textile Fabrics, Defendants.

Civ. Nos. 67-88-F, 67-1513-F.

United States District Court
C. D. California.

March 27, 1968.

Bernard B. Laven, Los Angeles, Cal., for plaintiff in Case No. 67–88–F, and for defendant in Case No. 67–1513–F.

Wm. Matthew Byrne, U. S. Atty., Larry L. Dier, Asst. U. S. Atty., Los Angeles, Cal., for defendant in Case No. 67–88–F and for plaintiff in Case No. 67–1513–F.

MEMORANDUM OPINION

FERGUSON, District Judge.

The matter before the court is a consolidation of two separate actions: A complaint filed by the government pursuant to 19 U.S.C. § 1592 for forfeiture of certain items of merchandise which it had seized, and a complaint filed by the owner of the merchandise to obtain its return.

## I. STATEMENT OF FACTS

John Bacall Imports, Ltd., is a one-man corporation, consisting of its owner John Bacall. It is in the business of importing fabrics from Italy and France.

For a number of years, John Bacall would travel to those two countries visiting textile manufacturers and merchants. He would purchase job lots and close outs, which are fragments of bolts of cloth or bolts of outdated patterns. The fabrics were shipped to Los Angeles, where Bacall would cut small samples and place them in two suitcases. He would then become a travelling salesman throughout the United States, selling from his samples. When he obtained orders, he would return to Los Angeles and ship the sold materials to his customers. He would then return to Europe and the processes would be repeated. As a result of business pressure, Bacall, in the summer of 1966, suffered a series of nervous breakdowns, requiring hospitalization here and in Europe.

The imports involved in the litigation, for the sake of abbreviation, will be referred to as Entries Nos. 66 and 67. No. 66 arrived in Los Angeles in April, 1966, and No. 67 in July, 1966. Both shipments were placed in a customs warehouse where an examination of the textiles was made by customs agents and samples taken by them to determine the composition of the goods. The invoices which accompanied the goods from Europe stated the textiles were silk and rayon.

Based upon the invoices, customs duties in the amount of $41,000 were paid by Bacall who, in addition, deposited corporate surety bonds in the sum of $95,000 to guarantee payment of additional duty in that amount.

The textiles were then released from customs and delivered to Bacall's warehouse where they were commingled with other textiles which had been imported, classified by customs and the duties paid. Bacall took pride in his products, and the evidence is undisputed that he kept his warehouse neat and clean and the merchandise shelved "like a drug store".

The samples of Entries Nos. 66 and 67 were analyzed by a customs chemist and this analysis showed that most of the samples were wool rather than silk and rayon. The duty on wool is considerably higher than on silk and rayon.

Customs agents then interviewed Bacall in October of 1966 in regard to an explanation of the incorrect invoices. Bacall at that time was obviously ill with his mental breakdown and could not give a satisfactory explanation of the falsity of the invoices. However, he informed the agents that the fabrics which comprised the two Entries were commingled with other fabrics. He also stated that he was considering bankruptcy.

On November 4, 1966, two agents went to Bacall's warehouse. The sole occupant at the time was Bacall's girl friend who was assisting him in processing the fabrics for shipment to customers, and no consent to any search or seizure was ever given to the agents. The warehouse, however, was an open place of business. The agents placed several stickers on the fabrics, not knowing whether they were placed on the 66 and 67 Entries or other entries. The language of the stickers was as follows:

"Warning

"United States Customs Seals must not be removed, compartment or package opened, or goods removed except in the presence of a United States Customs Officer. Penalty for failure to observe this requirement is fine and imprisonment. This does not insure freedom from inspection.

————, Inspector."

In addition to the printed stickers, the agents wrote out on legal size yellow papers the following:

"Notice

"All merchandise consigned to John Bacall Imports, Ltd. is under seizure by the U. S. Customs. This merchan-

dise must not be moved or tampered with."
and placed them on various walls within the warehouse.

The agents had been instructed by the customs agent in charge to go to the warehouse and if they saw any of the 66 or 67 Entries to seize them. It was apparent to them when they arrived there that they couldn't differentiate between those Entries and others.

On November 10, 1966, the customs agents returned to the warehouse with a moving van. The door was locked, so they removed the pins from the hinges, removed the front door and entered. The agents then proceeded to take away every piece of fabric, as well as two trash barrels. The condition of the warehouse when the agents were finished shocks the conscience. The warehouse was left in shambles. As a result of the manner of the seizure, Bacall's landlord evicted him.

In addition to seizing all the textiles, the agents made a thorough search of the file drawers and desks in the warehouse office in a search for documents and business records.

At no time before November 10, 1966, did any government agent have any knowledge that Bacall knew that the invoices were false. Only after this date did the government obtain facts which led them to conclude that Bacall requested false invoices from foreign suppliers. Such facts were not obtained until on or about October, 1967, a year later, when the government made an investigation of Bacall's suppliers in Italy and France.

At no time was a search warrant ever obtained from a judicial officer and at no time was there any reason or emergency why a search warrant could not have been obtained.

The customs officers had conferred with a deputy United States Attorney in regard to the necessity of obtaining a search warrant for the warehouse. He informed them that a search warrant was not required. In regard to the search for business records, the agent who made the search stated that although the deputy United States Attorney told him he had to have a search warrant for such items, he went ahead anyway and searched without one.

At no time did any agent ever give a receipt for the goods seized in accordance with Customs Regulations 23–11, 19 C. F.R. § 23.11(a), which provides as follows:

"(a) Any customs officer having reasonable cause to believe that a violation has been committed of any law, the enforcement of which is within the jurisdiction of the Customs Service, by reason of which any property has become subject to forfeiture, shall seize such property if available. A receipt for seized property shall be given at the time of seizure to the person from whom the property is seized. A collector of customs may adopt a seizure made by a person other than a customs officer if such collector has reasonable cause to believe that the property is subject to forfeiture under the customs laws."

## II. ISSUES PRESENTED

On these facts Bacall seeks an order directing the return of everything taken from his warehouse on November 10, 1966, and the government seeks an order of forfeiture of the 66 and 67 Entries under 19 U.S.C. § 1592. That section provides, in effect, that if any person attempts to introduce into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, whether or not the United States is deprived of any lawful duties, or is guilty of any wilfull act or omission by which the United States is deprived of any lawful duties, such merchandise shall be subject to forfeiture.

19 U.S.C. § 1595 provides that if a customs agent shall have cause to suspect the presence of any merchandise which has been brought into the United States contrary to law, he may apply under oath to any judicial officer for and shall thereupon be entitled to a warrant

to enter any place and to search for and seize such merchandise.

The government claims that the overriding issue in the case is whether or not in October, 1967, when it filed its forfeiture lawsuit, a year after the seizure, it had probable cause to believe that the 66 and 67 Entries were brought into the country under false invoices. It claims that if it did, then everything that was done to Bacall by the government on November 4 and 10, 1966, must be disregarded.

## III. ILLEGAL SEARCH AND SEIZURE

The court concludes that the government's position is incorrect. It is without question that when the government seized the merchandise in November of 1966, it was not in possession of any facts which would permit it to obtain a search warrant. It was not until a year later that facts were obtained which would lead to the probable cause requirement for obtaining a warrant. Yet, without possessing such facts the government removed a warehouse door, stripped the warehouse, left it in shambles and conducted a knowingly unlawful search for business records, even though they didn't have knowledge of sufficient facts to obtain a search warrant.

The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

 Mr. Justice Clark, in Ker v. State of California, 374 U.S. 23, 32–33, 83 S.Ct. 1623, 1629, 10 L.Ed.2d 726 (1963), stated that:

"Implicit in the Fourth Amendment's protection from unreasonable searches and seizures is its recognition of individual freedom. That safeguard has been declared to be 'as of the very essence of constitutional liberty' the guaranty of which 'is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizen * * *.' [Citations omitted.] While the language of the Amendment is 'general,' it 'forbids every search that is unreasonable; it protects all, those suspected or known to be offenders as well as the innocent, and unquestionably extends to the premises where the search was made * * *.' Go-Bart Importing Co. v. United States, 282 U.S. 344, 357, 51 S.Ct. 153, 75 L.Ed. 374 (1931). Mr. Justice Butler there stated for the Court that '[t]he Amendment is to be liberally construed and all owe the duty of vigilance for its effective enforcement lest there shall be impairment of the rights for the protection of which it was adopted.' Ibid. He also recognized that '[t]here is no formula for the determination of reasonableness. Each case is to be decided on its own facts and circumstances.'"

Long ago, Mr. Justice Brandeis, in Burdeau v. McDowell, 256 U.S. 465, 477, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921) (dissent), stated:

"At the foundation of our civil liberty lies the principle which denies to government officials an exceptional position before the law and which subjects them to the same rules of conduct that are commands to the citizen. And in the development of our liberty insistence upon procedural regularity has been a large factor. Respect for law will not be advanced by resort, in its enforcement, to means which shock the common man's sense of decency and fair play."

 It is well established that border searches are outside the protection of the Amendment cited. A search which would be unreasonable if conducted by police in an ordinary case may be rea-

sonable when conducted by customs officials in lawful pursuit of unlawful imports, but only when incident to a border search. Alexander v. United States, 362 F.2d 379 (9th Cir.), cert. denied, 385 U.S. 977, 87 S.Ct. 519, 17 L.Ed.2d 439 (1966).

While the merchandise was under the control of customs in the customs warehouse upon entry, the agents had a right and a duty to inspect, search and seize illegally imported merchandise. But when the duty was paid, a bond given for possible additional duty, and the goods released to Bacall and placed in his warehouse, the mantle of the Amendment fell.

■ The basic issue presented for the court's determination is whether or not the customs officials had probable cause to suspect that the merchandise which ultimately was seized had been fraudulently imported. Only then would the agents, who were on Bacall's public premises without a search warrant, have had the authority to seize the goods. Clearly, the agents had insufficient information to justify the issuance of a search warrant. It then logically follows that they had insufficient information to constitute probable cause to suspect fraudulent importing. The only facts by which the agents could have suspected that any fraudulent intent underlay the false invoices were discovered one year after seizure.

Chapman v. United States, 365 U.S. 610, 613, 81 S.Ct. 776, 778, 5 L.Ed.2d 828 (1961), established that " 'one's house cannot lawfully be searched without a search warrant, except as an incident to a lawful arrest therein' * * * [but] 'Belief, however well founded, that an article sought is concealed in a dwelling house furnishes no justification for a search * * * without a warrant. And such searches are * * * unlawful notwithstanding facts unquestionably showing probable cause.' " No arrest was involved in our case; therefore that exception to the general rule is not available.

Two other justifications for the seizure have been presented but are totally without merit. The government contends that extenuating circumstances existed to justify the agents placing the stickers indiscriminately on the merchandise on November 4, 1966. Chapman v. United States, 365 U.S. at 615, 81 S.Ct. at 779, held that " 'There are exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a * * * warrant for search may be dispensed with.' " See also Ker v. State of California, 374 U.S. 23, 42 n. 13, 83 S.Ct. 1623 (1963), and Corngold v. United States, 367 F.2d 1, 3 (9th Cir. 1966).

■ A half-hearted justification lies in the government's contention that at the October, 1966, meeting Bacall told the customs agents that he was in serious financial difficulty and was considering bankruptcy. This attempt to so justify the seizure through "exceptional circumstances" is vitiated by the surety bond deposited by Bacall.

■ The second exception to a search and seizure without a search warrant and not incident to a lawful arrest is set forth in Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968), wherein it was stated:

"It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure * * *."

Implicit in the Court's reasoning is that the object seized have some relevancy to a crime. See, e. g., Davis v. United States, 327 F.2d 301, 305 (9th Cir. 1964); Hiet v. United States, 125 U.S. App.D.C. 338, 372 F.2d 911 (1967, rehearing denied en banc). In *Harris*, an owner's registration card was found in an automobile impounded by the police. The government maintains that the customs agents were legally in Bacall's public warehouse. Clearly, the merchandise was in plain view. But that by itself cannot justify seizure. See Abel v.

United States, 362 U.S. 217, 234, 80 S. Ct. 683, 4 L.Ed.2d 668 (1960).

The merchandise had to be evidence or fruits of a crime or had to relate to a crime. Such is not the case here. On its face, possession was lawful. In the *Hiet* case, the court held a search warrant was unnecessary to search a car abandoned by a fugitive and in which United States mail bags were in plain view. It was stated:

"The only question is whether or not the mail bags could be seized. Although it is possible that the mail bags could have been in appellant's possession lawfully, the circumstances * * * gave the officers probable cause to believe that a crime involving the mail bags had been, and was being, committed. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). * * * The officers could seize the mail bags as a fruit of the crime." 372 F.2d at 912.

Accord, United States ex rel. Stoner v. Myers, 219 F.Supp. 908, 911 (E.D.Pa. 1963), aff'd, 329 F.2d 280 (3d Cir. 1964).

█ The only possible link to a crime that the agents possessed was the knowledge of an incorrect invoice. That by itself cannot justify seizure, however, because an incorrect invoice is not evidence of a crime. No circumstances existed to justify suspicion of a crime, as they did in Hiet v. United States, supra.

█ Although 19 U.S.C. § 1592 states that merchandise imported by means of "fraudulent or false invoice" shall be subject to forfeiture, the clear meaning is that only *fraudulently* imported merchandise is so subject. Jen Dao Chen v. United States, 385 F.2d 935 (9th Cir. 1967). See 230 Boxes More or Less of Fish v. United States, 168 F.2d 361, 365 (6th Cir. 1948), citing Origet v. United States, 125 U.S. 240, 8 S.Ct. 846, 31 L.Ed. 743 (1888).

Absent either the existence of contraband or known fraudulent imports, and despite the merchandise being in plain view, the customs agents had no right to seize or even to place warning labels on

the merchandise. Customs Regulations, 19 C.F.R. § 23.11(g), states that:

"(g) A customs officer who is lawfully on any premises and is able to identify merchandise which has been imported contrary to law may seize such merchandise without a warrant."

The agents had no probable cause to suspect fraudulent importing because facts to support the suspicion were not discovered until one year after seizure. Obviously then, identification of such imports was impossible. Thus, the plain view exception is inapplicable.

The subsequent seizure six days later cannot in any way be justified because it was based upon the constructive seizure of November 4, 1966, which is now held illegal. The second entry was not conducted pursuant to a search warrant, was not incident to a lawful arrest and was not surrounded by any of the exceptions to the general rule requiring a warrant.

The most recent pronouncement of the Supreme Court is Camara v. Municipal Court, 387 U.S. 523, 535, 87 S.Ct. 1727, 1734, 18 L.Ed.2d 930 (1967), which supports the conclusion that the seizure here was illegal:

"[P]ublic interest [in recovering stolen or contraband goods] would hardly justify a sweeping search of an entire city conducted in the hope that these goods might be found. Consequently, a search * * *, even with a warrant, is 'reasonable' only when there is 'probable cause' to believe that they will be uncovered in a particular dwelling."

Under the present facts, no stolen goods or *per se* contraband was involved. Furthermore, the agents could not have had probable cause to know the whereabouts of any such goods or that the goods were fraudulently imported because they had no probable cause to even suspect that fraudulent intent was involved in the importation. Therefore, in no conceivable manner could the seizure of the merchandise be justified.

In normal circumstances the seized property would be ordered returned without further analysis by the court. However, the merchandise seized here was imported into the country by means of a false invoice statement, thus raising the issue of forfeiture.

## IV. FORFEITURE

 The issue presented is whether or not the government, in light of the illegal seizure of Bacall's merchandise, is entitled to retain possession of such merchandise under the forfeiture statute, 19 U.S.C. § 1592.

The court expressly holds that forfeiture is not to be permitted under these circumstances. Considering the effect of the Fourth Amendment guaranty against unlawful searches and seizures upon the rights of the claimant to the seized property, the court places its emphasis upon the principle enunciated in Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 304, 87 S.Ct. 1642, 1648, 18 L. Ed.2d 782 (1967), that "even though the Government asserts a superior property interest at common law * * * the principal object of the Fourth Amendment is the protection of privacy rather than property * * *. [The courts] have increasingly discarded fictional and procedural barriers rested on property concepts."

This issue was squarely presented in Berkowitz v. United States, 340 F.2d 168, 8 A.L.R.3d 463 (1st Cir. 1965), which involved a libel to forfeit certain moneys used in violation of the revenue laws. Federal agents, acting neither under a warrant nor with sufficient probable cause to justify their conduct, arrested the defendant and seized from his possession United States currency and negotiable checks which had been used in violation of the revenue laws.

The court explicitly held that the government would not be permitted to enforce forfeiture of the moneys when it had discovered and seized them only by virtue of a direct invasion of the owner's constitutional rights in an unlawful arrest incident to which the seizure occurred. The holding was based upon the conclusion that to permit the forfeiture would place too great a premium on unconstitutional conduct.

A concurring opinion placed a limitation upon this broad theory by holding that principles of deterrence would not prevent forfeiture of property the possession of which is contrary *per se* to public policy, as narcotics or counterfeiting plates. Such property is not involved here.

The argument that the owner of property which constitutes something less than contraband *per se* is said to have lost all property rights upon its illegal use and that he is without standing to object to its illegal seizure was emphatically laid to rest by the *Berkowitz* decision. The revenue statute in question there was interpreted to mean that property rights in the owner were lost only when (1) the search leading to forfeiture was pursuant to a valid search warrant, or (2) the property is lawfully seized by the government, or (3) it otherwise reaches the government without any violation of the Constitution by *anyone*. None of those circumstances exist in this case.

It is important to reiterate a principle which is particularly apt in disposing of the government's contentions in the present case:

"The safety of our society depends more upon the preservation of fundamental liberties than upon the punishment of a person whose offense we can prove only through subverting those liberties." Berkowitz v. United States, 340 F.2d at 171.

If the search and seizure of Bacall's merchandise was unconstitutional in that protected rights were unjustifiably invaded, these rights would be further infringed if the government were permitted to appropriate for itself that merchandise. This follows from a logical extension of the principle enunciated by Mr. Justice Holmes in Dodge v. Unit-

ed States, 272 U.S. 530, 532, 47 S.Ct. 191, 192, 71 L.Ed. 392 (1926), that:

"If the search and seizure are unlawful as invading personal rights * * * those rights would be infringed yet further if the evidence were allowed to be used."

The overriding principle behind both prohibitions is that the government and its agents must be the first to strictly obey the nation's laws. The government must not be permitted to benefit in any manner from its disregard of the laws which shape and guide its very actions. Either to allow illegally seized evidence into a trial or to allow forfeiture of property, the possession of which is not illegal, which the government found to be forfeitable solely through unlawful means would be a basic injustice to the manifest purpose of the Fourth Amendment. This exact reasoning was the basis of the *Berkowitz* case.

In the most recent United States Supreme Court pronouncement on this general subject, One 1958 Plymouth Sedan v. Commonwealth of Pennsylvania, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965), it was established that evidence resulting from the search of a car, the obtaining of which violates the Fourth Amendment, may not be relied upon to sustain a forfeiture. While the holding is not directly dispositive of the essential issue here, the language in *Plymouth Sedan* is highly relevant. The seizing State, Pennsylvania, had relied upon United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951), and Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948), both of which held in dictum that their rulings that contraband was excludable as illegally seized did not mean that the government was required to return the contraband, consisting of illegally imported narcotics and an unregistered alcohol still, to their owners. The Supreme Court explained that the nature of the contraband involved in those cases justified the nonreturn. Both concerned property the possession of which, with-

out more, constituted a crime. The return of *per se* contraband clearly would have frustrated the express public policy against possession of such property.

On the facts involved in *Plymouth Sedan*, the Court distinguished the above two cases:

"It is apparent that the nature of the property here, though termed contraband by Pennsylvania, is quite different. There is nothing even remotely criminal in possessing an automobile. It is only the alleged use to which this particular automobile was put that subjects Mr. McGonigle to its possible loss. And it is conceded here that the Commonwealth could not establish an illegal use without using the evidence resulting from the search which is challenged as having been in violation of the Constitution. Furthermore, the return of the automobile to the owner would not subject him to any possible criminal penalties for possession or frustrate any public policy concerning automobiles, as automobiles. This distinction between what has been described as contraband *per se* and only derivative contraband has indeed been recognized by Pennsylvania itself * * *. We, therefore, do not have a case before us in any way analogous to the contraband involved in *Jeffers* and *Trupiano* and these cases can in no way be deemed to impair the continued validity of *Boyd* [Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746] which, like this case, involved property not intrinsically illegal in character." 380 U.S. at 699–700, 85 S.Ct. at 1250. (Footnote omitted.)

The contraband involved in the present case falls within the banner of *Plymouth Sedan*. Therefore the dictum in *Trupiano*, supra, and *Jeffers*, supra, cannot justify forfeiture of Bacall's merchandise. Possession of such fabrics is not a violation *per se* of any law. It is only in the use to frustrate import and duty regulations that a violation occurred. Clearly, the Supreme Court in

drawing this distinction demanded not only the exclusion of non *per se* contraband from evidence, but more important to the present case directed by implication its return to the owner when the search or seizure was illegal.

 The Court firmly established that forfeiture proceedings, being quasi-criminal in character, are clothed with all the Fourth Amendment protections. Its object, like a criminal proceeding, is to penalize for the commission of an offense against the law. Therefore, any argument that constitutional prohibitions against unreasonable searches and seizures do not apply to actions seeking the return of seized property in conjunction with the government's concurrent action for forfeiture is not well taken.

In an analogous situation involving the return of seized original documents and copies, Goodman v. United States, 369 F.2d 166 (9th Cir. 1966), held that the appellant seeking return was entitled to repossession of the copies as well as the originals if the search or seizure was found to have violated the Fourth Amendment. Under the theory of both the *Berkowitz* and *Plymouth Sedan* cases, supra, the contraband involved in the present case is no different than the business records in *Goodman*. The possession of neither would be a violation of any law and, therefore, return of such would frustrate no public policy.

By virtue of the above-cited authorities, the court need not pay heed to United States v. Eight Boxes, etc., 105 F.2d 896 (2d Cir. 1939), which introduced a theory of forfeiture largely discredited today under the modern interpretation of the Fourth Amendment. The court there permitted forfeiture of all contraband, regardless of whether or not possession of it would be a violation of the law. The validity of this holding is difficult to sustain, especially in light of Warden, Md. Penitentiary v. Hayden, supra. The better reasoned result follows from Berkowitz v. United States, supra, which emphasizes the protection of privacy over forfeiture of property unless that property is contraband *per se*.

Adhering to the implied directive in One 1958 Plymouth Sedan v. Commonwealth of Pennsylvania, supra, and the explicit holding of the *Berkowitz* case, supra, the court directs the return of all property and merchandise seized from Bacall's warehouse by the customs agents on November 4 and 10, 1966. The government's complaint for forfeiture is thereby dismissed.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to the provisions of Rule 52 of the Federal Rules of Civil Procedure, this opinion shall constitute the findings of fact and conclusions of law of the court.

## JUDGMENT

It is the judgment of the court, and the same are directed to be prepared separately and entered under Rule 58 of the Federal Rules of Civil Procedure, as follows:

1. In Civil No. 67–88–F it is adjudged and decreed:

 (a) The seizure of plaintiff's property is in violation of the Fourth Amendment.

 (b) The defendant is directed to return forthwith to the plaintiff all items of property.

 (c) The court retains jurisdiction over the parties with reference to the action to make such further orders as may be proper to carry out the judgment.

 (d) The plaintiff shall recover its costs.

2. In Civil No. 67–1513–F it is adjudged and decreed:

 (a) The seizure of the property is in violation of the Fourth Amendment.

 (b) The plaintiff is not entitled to forfeiture, and forfeiture is denied.