UNITED STATES of America, Plaintiff-Appellee,

v.

John BACALL, Defendant-Appellant.

UNITED STATES of America. Plaintiff-Appellee,

v.

JOHN BACALL IMPORTS, LTD.. Defendant-Appellant.

Nos. 25428, 25429.

United States Court of Appeals. Ninth Circuit.

May 11, 1971.

Rehearing Denied July 28, 1971.

4. See Pub.L. 89–506, 1966 U.S.Code, Cong. & Adm.News, p. 2518.

Herman F. Selvin (argued), Donald S. Greenberg, of Kaplan, Livingston, Goodwin, Berkowitz & Selvin, Beverly Hills, Cal., for defendants-appellants.

Larry L. Dier, Asst. U. S. Atty. (argued), Robert L. Meyer, U. S. Atty., David R. Nissen, Chief, Crim. Div., Los Angeles, Cal., for plaintiff-appellee.

Before BARNES, DUNIWAY and TRASK, Circuit Judges.

DUNIWAY, Circuit Judge:

Having waived jury trial and special findings of fact, Rule 23(a), (c), F.R. Crim.P., codefendants Bacall and John Bacall Imports, Ltd. were each convicted on four counts charging violation of 18 U.S.C. § 542 by falsely stating on Customs invoices the cost of fabrics purchased from the French supplier Blech Freres (Blech). Bacall was sentenced to serve two years imprisonment on each count, to run consecutively, and to pay a fine of $5,000.00 on each count, making a total term of 8 years imprisonment and a total fine of $20,000.00. John Bacall Imports, Ltd. was sentenced to pay a fine of $5,000.00 on each count, making a total fine of $20,000.00. We affirm the convictions on Counts I, III and IV, and reverse the convictions on Count II.

## A. The facts.

John Bacall Imports, Ltd., is a one-man corporation, consisting of its owner John Bacall. Bacall is in the business of importing fabrics from France and Italy.[1] His practice has been to travel to those countries, visiting various textile manufacturers and merchants and placing his orders with them. Bacall would engage a French (or Italian) agent to book space on a vessel leaving from a French (or Italian) port for Los Angeles; thus all the fabrics ordered during any given trip from the various French (or Italian) suppliers would arrive at Los Angeles at one time. Once the shipments were through Customs, Bacall would bring the fabrics to his warehouse, where he would break the shipments down and send the fabrics to his customers throughout the United States. Bacall generally paid his European suppliers by sending them cashier's checks drawn on various banks in or near Los Angeles. This cycle of European travel to place orders, shipment to Los Angeles, and payment by check recurred each year. In question here are shipments from France that arrived in Los Angeles in the months of June in the years 1963, 1964, 1965, and 1966.

All the fabrics consigned to Bacall aboard a given vessel arriving in Los Angeles would be documented in one Customs Entry; thus there was one Customs Entry for each of the French shipments here in question. Included in each Customs Entry were Special Customs Invoices (Customs form 5515), one corresponding to the fabrics purchased from each French supplier. Each invoice required Bacall to provide a full description of the fabrics from that supplier and to state the total cost of those fabrics.

In April, 1966 and July, 1966 two other shipments of fabrics consigned to Bacall arrived in Los Angeles. The fabrics were placed in a Customs warehouse, where Customs agents examined them and took samples to determine their

---

1. When we say, "Bacall" we refer to both appellants, unless a contrary intention is expressed.

composition. The fabrics were then released to Bacall, who transferred them to his warehouse and commingled them with other imported textiles on which the duties had previously been paid. The Customs agents ran laboratory analyses on the samples; the results of the analyses showed that many of the fabrics had been misdescribed in the invoices, always in such a way as to lower the duty to be paid. On November 4 and 10, 1966, Customs agents, acting without a warrant, went to Bacall's warehouse, seized all the fabrics there and transported them to a Customs warehouse in a moving van. They proceeded to make an exhaustive inventory of the fabrics, classifying them according to actual composition, declared composition, and supplier. The results of the inventory were collated and summarized by Agent Meglen, who oversaw the seizure and inventory.

On the basis of the inventory findings and with the approval of his supervisor, Agent Meglen set in motion a foreign investigation. On January 9, 1967, he wrote a lengthy letter, Exhibit 7, referring the Bacall case to the United States Customs representative in Paris, one Jacques Changeux, asking Changeux to refer the case to the French Customs Service (under the terms of a French-American agreement) and to request that French customs investigate Bacall's dealings with the French suppliers. Meglen's referral letter first reviewed generally the case existing against Bacall at that time. The case then consisted entirely of evidence, obtained before and during the seizure and inventory, showing that Bacall had knowingly misdescribed on Customs invoices both the composition (wool, silk, etc.) and the classification (embroidery, woven, knit, etc.) of the imported fabrics. Doubt also existed as to whether the shipments were actually "job lots" or "close-outs" as invoiced, but there was then no evidence that they were not.

Meglen's referral letter then set out general instructions for the conduct of the French investigation. The instructions included the following [Exhibit 7, page 4]:

"It is requested that you obtain the following information from the foreign shippers or sellers. * * *

Was the merchandise in fact, 'job lot'? * * * Similar fraudulent invoicing can be substantiated on importations dating back to 1964 * * *, and similar shipments have been received yearly by John Bacall Imports, Ltd., dating back to 1962.

* * * * * *

Do these invoices presented for Customs Entry reflect the true purchase price?

* * *?"

Meglen's referral letter then set out in considerable detail the evidence showing that Bacall had misdescribed the imported fabrics; most of the evidence had been obtained through the seizure and inventory. The evidence was organized to correspond to Bacall's various French suppliers. The *entire* entry under the Blech heading is as follows [Exhibit 7, page 9]:

"There does not appear to be any false invoicing with respect to composition for the fabrics from this seller. The fact that most of the fabric is invoiced in a manner which results in its classification at a high rate of duty would seem to preclude the possibility that it is other than as invoiced. The value of the fabric is, however, open to question."

Changeux duly referred the case to the French Customs Service. He wrote a second, much briefer, referral letter in French [defendant's Exhibit G], and attached to it Meglen's referral letter. Changeux's letter again summarized the case against Bacall, focussing again on misdescription of the fabrics. The letter made no mention of specific instances of possible undertatement of costs, though it did refer to general suspicions concerning stated prices, arising from the "job lot" and "close-out" characteri-

zations. Changeux's letter also stated that (translated from the French):

"We would be very grateful if you would undertake an investigation with the suppliers and the broker in question * * * to determine the composition and the real value of the exported merchandise, and if you would furnish us with all the documents relating to these exportations that you are able to obtain."

The case was assigned to Raymond Lalisse of the French Customs Service. Lalisse received the letters from Changeux and Agent Meglen sometime in January, 1967; he began the investigation into Bacall's French dealings on March 20, 1967, and had his first interview with persons at Blech on June 12, 1967. Lalisse obtained from the Blech files several letters showing what Bacall had paid Blech for fabrics purchased in the years 1963, 1964, 1965, and 1966. Using the information obtained from the Blech files, customs agents in this country examined Bacall's banking transactions and obtained cashier's checks used by him to pay Blech. The payments included special finishing and processing charges above and beyond the cost of the unfinished goods. The purchase prices stated on the Bacall Customs invoices for the Blech fabrics for each of these years reflected only the cost of the unfinished goods. Thus, using the letters obtained by Lalisse from the Blech files, and in this country on the basis of those files, the government was able to show that Bacall had knowingly understated the purchase price of the Blech importations for each of the shipments in question.

In addition to producing proof of Bacall's knowing understatement of the Blech prices, the French investigation yielded evidence that Bacall had requested from other foreign suppliers, and had submitted to Customs, false invoices, and that these false invoices invariably misdescribed the accompanying fabrics in such a way as to materially reduce the apparent duty owed. Armed with this evidence, the government sought an order of forfeiture under 19 U.S.C. § 1592 of the two shipments that had arrived in Los Angeles in April and July 1966 and that had been among the commingled materials seized without warrant from Bacall's warehouse. Bacall in turn brought a replevin action for the return of the seized goods, claiming that they had been unlawfully seized. The two actions were consolidated for trial in the district court. The court found the seizure to have violated Bacall's rights under the Fourth Amendment, denied the government's request for forfeiture, and ordered all the seized material returned to Bacall. John Bacall Imports, Ltd. v. United States, C.D.Cal., 1968, 287 F.Supp. 916.

The government appealed. We affirmed that part of the district court's judgment holding the seizure unlawful, but reversed that part of the judgment requiring the return of *all* the seized material. John Bacall Imports, Ltd. v. United States, 9 Cir., 1969, 412 F.2d 586. We found that

"[p]rior to trial, the government developed other evidence having no connection with, or relation to, the search and seizure. * * * It showed generally that in many cases John Bacall instructed his foreign suppliers to furnish separate invoices covering different costs in the processing of the raw materials. Bacall submitted only one of the invoices to Customs, thus understating the cost of the merchandise. In other cases, the description in the invoice was incorrect and Bacall knew it to be so.

There was also proof developed that Bacall paid substantially more for the merchandise than was reflected on the submitted invoices. His income tax return for the year involving [the importations of April and July 1966] showed his cost for the merchandise to be $230,000 whereas the amount declared to Customs was only $50,000.

None of this evidence recited generally above was in any way the fruit of the search and seizure. Moreover this

evidence was in no way connected with or related to such search and seizure.

\*   \*   \*   \*   \*   \*

\* \* \* The two cases are remanded to the district court for further proceedings in the light of this opinion. The district court will determine on evidence, independent of and not connected with the search and seizure, what merchandise should be forfeited pursuant to 19 U.S.C. § 1592." 412 F.2d at 588–589.

On July 31, 1968, the Grand Jury indicted Bacall on seven counts of violating 18 U.S.C. § 542, entry of goods by means of false statements. Ultimately Bacall was convicted on Counts I–IV, a motion of acquittal being granted as to Counts V–VII for insufficient evidence. The charges proved at trial, and the only charges at issue here, were that, on each of four occasions, Bacall had submitted Special Customs Invoices that "falsely stated the cost of the fabric purchased from the foreign seller Blech" and that Bacall "then and there well knew" that to be so. The government expressly waived prosecution on all charges concerning Bacall's alleged misdescription of the composition and classification of the imported materials. The government's proof of each of the four charges consisted of comparing the cost stated for the Blech shipment as shown on the invoices in the respective Customs Entries with the payment made by Bacall to Blech, as shown by the letters and checks obtained during and as a result of the French investigation.

By far the most significant issue raised at trial, and the major issue raised on appeal, is the question whether the papers taken from the Blech files and the cashier's checks were tainted by the unlawful seizure of the materials in Bacall's warehouse. The trial judge addressed himself to this issue, at the conclusion of the trial, as follows:

"It is implicit in that finding [in the forfeiture trial, 287 F.Supp. 916] that the search tainted or the seizure tainted the entire investigation made afterwards, but the circuit in its own independent investigation of the facts on appeal found that I was wrong. \* \* \* I can't understand why that \* \* \* finding of fact was made, because every reasonable man who investigated the evidence would have to agree that it was tainted.

But for the finding of the court of appeals in the civil cases [412 F.2d 586], I would have to find that the search was tainted, but I have to obey the law and I have to obey the mandate of the circuit even though I may disagree with it, and because of that mandate and because of that finding set forth in the Ninth Circuit's opinion, I must find on that basis only that I am mandated to find that the investigations in France \* \* \* [were] not tainted by the search.

To me, [Defendant's] Exhibits A, B and F without any equivocation demonstrate the taint, but all of that was brought out at the civil trial, \* \* \* and if the circuit held I was wrong I have to admit that I was wrong.

Therefore, your motions [to suppress the letters and checks] are denied. \* \* \* "

B. *The letters and checks were not tainted by the seizure.*

Bacall contends that the trial judge erred in believing himself "mandated" by our decision in the forfeiture case, 412 F.2d 586. We have considerable doubt whether the decision in the forfeiture cases is *res judicata* or creates an estoppel by judgment in this case. However, we need not decide that question. We are convinced that, on the merits, and without regard to the possible effect of that decision, the evidence on which the convictions in this case rest was not fatally tainted by the seizure.

The trial judge admitted that evidence. If he was correct in doing so, the judgment should stand, whether or not the reason given by him was correct.

See Smith v. United States, 9 Cir., 1949, 173 F.2d 181, 185; Wagner v. United States, 9 Cir., 1933, 67 F.2d 656, 657; *cf.* Wilson v. United States, 9 Cir., 1958, 250 F.2d 312, 324.

Bacall argues that Agent Meglen would not have requested the French investigation but for the information obtained through the seizure and the subsequent inventory. And of course the French investigation would not have been undertaken but for Meglen's request.

We assume *arguendo* that the French investigation would not have been undertaken but for the illegal search and seizure. However, as the Supreme Court said in Wong Sun v. United States, 1962, 371 U.S. 471, 487–488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441:

> "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at· by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint'."

Accord, Alderman v. United States, 1969, 394 U.S. 165, 180–181, 89 S.Ct. 961, 22 L.Ed.2d 176; United States v. Williams, 9 Cir., 1970, 436 F.2d 1166. Put somewhat differently, what kind of *direction* and *impetus* did the illegal seizure give to the Blech investigation? This question is often a difficult one. See generally, Pitler, "The Fruit of the Poisonous Tree" Revisited and Shepardized, 56 Calif.L.Rev. 579 (1968); Comment, Fruit of the Poisonous Tree—A Plea for Relevant Criteria, 115 U.Pa.L. Rev. 1136 (1967). It is so in this case. We start, therefore, by reviewing the criteria that courts have applied in implementing the rule of *Wong Sun*.

■ Such criteria abound. Even if the controverted evidence could have been traced directly or indirectly from the leads turned up by the illegal search, the evidence will nevertheless be admissible if in fact "the Government learned of [it] 'from an independent source'." Wong Sun v. United States, *supra*, 371 U.S. at 487, 83 S.Ct. at 417, quoting Silverthorne Lumber Co. v. United States, 1920, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319; United States v. Scharf, 9 Cir., 1970, 421 F.2d 1239; Durham v. United States, 9 Cir., 1968, 403 F.2d 190, 196. Alternatively, it may be crucial to a determination of taint that, at the time of their initial illegal action, the officers had no reason to suspect the defendant of any crime other than that in connection with which the action was undertaken, and that they had no reason to believe that the action would turn up specific evidence of any other crime. See United States v. Diaz, 1 Cir., 1970, 427 F.2d 636, 637. Put more bluntly, it may be crucial "that an object of the illegal conduct was the securing of the evidence sought to be suppressed." Allen v. Cupp, 9 Cir., 1970, 426 F.2d 756, 759.

■■ If the controverted evidence is obtained by information available to the officers "without resort to any clue or knowledge gained from the items unlawfully seized," a strong case exists for the absence of a taint. Standard Oil Co. v. State of Iowa, 8 Cir., 1969, 408 F.2d 1171, 1177. Where the evidence sought to be suppressed was discovered through utilization of some legally obtained leads as well as some illegally obtained leads, the substantiality of the legally obtained leads may influence the determination whether the evidence ought to be suppressed. See James v. United States, 1969, 135 U.S.App.D.C. 314, 418 F.2d 1150, 1152; *contra*, United States v. Schipani, 2 Cir., 1969, 414 F.2d 1262, 1266. And if the illegally obtained leads were so insubstantial that their role in the discovery of the evidence sought to be suppressed "must be considered *de minimis*," then suppression is inappropriate. Durham v. United States, *supra*, 403 F.2d at 196. See McGarry v. United States, 1 Cir., 1967, 388 F.2d 862, 871.

Where the investigation that led to the controverted evidence "was not intensified by reason of any tainted information," the case for suppression is again weaker. United States v. Schipani, *supra*, 414 F.2d at 1266.

Finally, an operative though often unarticulated factor in the determination whether to suppress evidence discovered in part through prior unlawful action is the offensiveness of that action; "where that conduct is particularly offensive the deterrence ought to be greater and, therefore, the scope of exclusion broader." Comment, *supra*, 115 U.Pa.L.Rev. at 1151; see also *id.* at 1151–53.

In applying these criteria to the case before us, we reiterate our assumption that illegal seizure *was* a "but for" cause of the foreign investigation. The question to be answered is not whether the Blech letters and checks would have been discovered in the absence of the seizure. It is, rather, whether anything seized or any leads gained from the seizure tended significantly to direct the foreign investigation toward those specific letters and checks—whether the Customs officers had after seizure a substantially greater reason to seek those specific items than they had had before the seizure. We conclude that they did not and that the letters and checks were not tainted and were properly admitted into evidence.

*First:* We cannot say that the discovery of the letters and checks had a source wholly "independent" of the unlawful seizure; it resulted from the foreign investigation the major purpose of which was to follow up other, concededly tainted, leads obtained from their seizure. But the source of the discovery is not conclusive on the issue of taint. Even when illegally seized evidence is a "but for" source of the subsequent discovery of additional evidence, whether that additional evidence was come at by an "exploitation" of the illegal seizure will depend upon the precise role the illegal seizure *in fact* played in the subsequent discovery. *Cf.* Harrison v. United States, 1968, 392 U.S. 219, 224, 88 S.Ct.

2008, 20 L.Ed.2d 1047. For example, when officers through serendipity discover evidence concerning a suspect whom they are unlawfully investigating in connection with another, different crime, the new evidence is not tainted where the officers discovered it only because their unlawful investigation fortuitously put them in a position to do so and where their unlawful investigative intent did not extend to the additional evidence. United States v. Williams, *supra*, 436 F.2d at 1170; *cf.* Agius v. United States, 5 Cir., 1969, 413 F.2d 915, 919–920.

*Second:* Like the discovery in *Williams*, the eventual discovery of the letters and checks evidencing Bacall's understatement of the Blech Freres purchase prices was basically an example of investigatory serendipity. In seizing the fabrics and undertaking the subsequent inventory, the Customs agents were concerned with discovering additional misdescriptions of the composition and classification of the fabrics, rather than with uncovering evidence that Bacall had understated the purchase price. Indeed, Agent Meglen testified that, during the inventory, he did not even check the Blech fabric to determine what its value might be. Thus it was not the case "that an object of the illegal [seizure] was the securing of the evidence sought to be suppressed." Although as a result of his previous examination of the Customs Entries (which were, of course, in the possession of the government all along) Agent Meglen felt that the stated Blech purchase prices did not "seem reasonable," nothing in the record suggests that, at the time of the seizure, Agent Meglen suspected Bacall of willfully understating those prices or that he had any reason to believe that the seizure and inventory would yield evidence supporting any such suspicion.

*Third:* The Blech letters and checks were obtained "without resort to any clue or knowledge gained from the items unlawfully seized." Agent Meglen's referral letter summarized what was known about Bacall's dealings with *all*

his suppliers, not just those transactions that contained evidence of illegality. Blech was included in the letter despite the absence of any evidence that Blech fabrics had been misdescribed by Bacall, simply because Bacall was known to have dealt with Blech over a period of years. The mere presence of the Blech entry in Meglen's referral letter does not in itself suggest that the seizure and inventory uncovered any evidence of illegality in the Blech transactions.

Moreover, nothing in the record suggests that the seizure and the inventory uncovered any such evidence. Agent Meglen himself testified to that effect:

"Q. As specifically regards the French seller Blech Freres, did you obtain any information in the seizure or from the merchandise itself that helped you in making your recommendations as far as a foreign investigation of Blech Freres was concerned,

A. No, I didn't."

At the conclusion of the inventory the Customs officers had no more reason to suspect that Bacall had understated the Blech prices than they had at the time of the seizure. True, Agent Meglen did testify that in his referral letter he concentrated "on the possibility of undervaluation" of the Blech fabric because the results of the inventory showed that no Blech fabrics had been misdescribed.[2] But eliminating one suspicion (misdescription) is not to be equated with uncovering affirmative evidence supporting another (understatement of price), even though the former may in theory aid an investigation by establishing that one less lead need be followed. No evidence of understatement of the Blech prices was even adumbrated as a result of the inventory. Although Agent Meglen's referral letter stated that the "value of the [Blech] fabric is  *  *  * open to question," the opening was no larger after than before the seizure.

Nor does it even appear that Agent Meglen had, after the seizure and the inventory, any reason to believe that the contemplated foreign investigation would turn up specific evidence that Bacall had understated the prices of the Blech Shipments. Bacall argues to the contrary, pointing to the Blech entry in Meglen's referral letter, which states that "The value of the fabric, however, is open to question." Bacall asks us to read that entry in light of one of Meglen's general instructions to the foreign investigator: "Do these invoices presented for Customs entry reflect the true purchase price?" Bacall's argument is, apparently, that this general and broad instruction was given direction and focus by Meglen's statement that the Blech prices were "open to question." We think just the opposite: that the highly tentative statement concerning Blech dissipated the significance of the already unspecific instruction so far as Blech was concerned. And Lalisse's testimony supports our conclusion. Lalisse testified that he read the entire referral letter, including the general instruction concerning the invoiced purchase prices. He nonetheless concluded that Meglen's brief reference to the Blech prices being "open to question" was "not enough for me to think that you attach much importance to it."[3]

2. Meglen's testimony was as follows:
"Q. Did you examine the Blech Freres fabric before you wrote the [referral] letter?
A. I would say that I looked at the Blech Freres fabric.
Q. And did you check it to see anything about the value?
A. No, no.
Q. You had no interest in doing that?
A. All I did was inventory the fabric. My initial interest was only—since the fabric had been invoiced as wool, I felt there was no likelihood of false description since [wool] received a high rate of duty, so I concentrated instead in my report on the possibility of undervaluation because of the low value shown for wool fabric."

3. The relevant excerpt of Lalisse's testimony is as follows:
"Q. Had your [sic] originally planned to see Blech Freres?

*Fourth:* The aspect of the investigation dealing with Bacall's frequent descriptions of imported fabrics as "job lots" or "close-outs" did not taint the discovery of the letters and the checks. It is true that the Customs officers had some doubts about the accuracy of many of these descriptions, and Agent Meglen did request, in his general instructions, that the foreign investigation look into this question. Both Meglen's letter and the testimony of former Customs Agent Cummings show, however, that these doubts had already existed well prior to the illegal seizure, and nothing in the testimony or exhibits suggests that any discoveries made in the course of the seizure or the inventory increased those doubts. In any case, the Blech letters and checks had no tendency by themselves to show that Bacall had falsely described the Blech fabrics as "job lots" or "close-outs." The source of Bacall's understatement of the prices was his omission of finishing costs and special charges that should have been added to the prices of the unfinished goods; simple payment records, such as the letters and checks, suffice to prove such understatement, but they do not suffice to show deliberate mislabelling as "job lots" or "close-outs."

*Fifth:* Even if we tread on thin ice in asserting that no leads concerning the Blech understatement resulted from the seizure and that the seizure in no way directed additional suspicion toward the Blech transactions, we think that any such leads as may have been obtained were *de minimis*. Discovery of the letters and the checks was a consequence primarily of the fact that the foreign investigation was undertaken at all, not of the fact that it was undertaken only after the seizure. Even the request of Changeux, that French Customs agents determine the real value of the exported merchandise and obtain available relevant documents, had no evident genesis in the specific information acquired as a product of the seizure. Moreover, to the extent that Changeux's request goes beyond any of Agent Meglen's general instructions, the request is not traceable to the seizure, and the results of the French investigation are not tainted by it. Particularly in light of Lalisse's attitude toward the investigation of the Blech transactions, see note 3 *supra*, any taint that may exist is *de minimis*.

*Sixth:* The Blech inquiry was not "intensified by reason of any tainted information." Nothing in the record suggests that Blech was investigated more intensively than it would have been had the foreign investigation preceded the seizure; indeed, an argument might be made to the contrary, for the customs agents concentrated on Bacall's misdescription of the goods, and after the seizure they might have thought they already had most of the evidence they needed. Certainly the timing of the foreign investigation is attributable to the seizure. To say, however, that the investigation occurred when it did is to say only that the seizure was a "but for" cause of the Blech investigation, not that it intensified it.

*Seventh:* Without possessing a search warrant or even facts sufficient to constitute probable cause, the Customs

A. [Lalisse]. No. To tell you the truth, I went to see Blech Freres. I take [*sic*] the opportunity of another trip to the east of France to make the verification.
Q. In other words, you were going somewhere else and you decided to stop off and see Blech Freres?
A. That's right.
Q. Why did you originally not decide to go see anybody at Blech Freres?
A. Just because before I started this investigation I read carefully the report being forwarded—being attached to the request of the U.S. Customs attache in Paris, and I marked the suppliers which I thought were the most important to be seen first.
Q. And you didn't think Blech Freres was most important to be seen?
A. No.
Q. Why?
A. Because—you see, when I read that sentence: 'But the value of the fabric is, however, open to question,' this was not enough for me to think that you attach much importance to it."

agents "removed a warehouse door, stripped [Bacall's] warehouse, left it in shambles and conducted a knowingly unlawful search for business records." John Bacall Imports, Ltd., v. United States, C.D.Cal.1968, 287 F.Supp. 916, 920. Such action is by no means inoffensive. Compare See v. City of Seattle, 1967, 387 U.S. 541, 543, 87 S.Ct. 1737, 18 L.Ed.2d 943. It is, however, much less offensive than the action taken in Henderson v. United States, 9 Cir., 1967, 390 F.2d 805, which Bacall urges us to follow. That case involved a strip search, including an attempted vaginal search, of a woman crossing the border from Mexico into the United States. In *Henderson* the first search may have been little more than a "but for" cause of the second. Nevertheless, the second search was suppressed because any search of the body, and especially a strip search, is offensive in the extreme. Even a frisk for weapons has been called "a severe, though brief, intrusion upon cherished personal security, and * * * surely an annoying, frightening, and perhaps humiliating experience." Terry v. Ohio, 1968, 392 U.S. 1, 25, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889. The search in *Henderson* was much more so.

By comparison, the illegal seizure from Bacall's warehouse involved a significantly less offensive intrusion. Had Bacall's home been searched, the indignity suffered would not have been as great as that in *Henderson*. The indignity suffered in an unlawful search of a warehouse is still smaller. *Cf.* See v. Seattle, *supra*, 387 U.S. at 545–546, 87 S.Ct. 1737. The lesser degree of offensiveness permits a less extensive scope to be given to the taint resulting from the illegal seizure, thus accommodating to a degree two antithetical objectives, deterring illegal seizures and obtaining evidence of crimes.

A less extensive taint does not mean that unlawful seizures such as this one are to go undeterred. We agree with the trial judge that, had Bacall been prosecuted for falsely stating the composition of the fabrics, "[t]here would be no way in the world that [the government] could remove the taint of the illegal search." We think that threat constitutes adequate deterrence. As we said in Durham v. United States, *supra*, 403 F.2d at 196,

"The price is too high and the advantage too uncertain to make it reasonable to suppose that law enforcement officers will be encouraged to indulge in unlawful searches, knowing that what they find will be suppressed, in the hope of obtaining admissible evidence as remote and fortuitously acquired as this."

Accord, Allen v. Cupp, 9 Cir., 1970, 426 F.2d 756, 759; Collins v. Beto, 5 Cir., 1965, 348 F.2d 823, 827 & n. 8; *cf.* Pitler, *supra*, 56 Calif.L.Rev. at 586–87; Comment, *supra*, 115 U.Pa.L.Rev. at 1148. And for a factual situation in some respects very close to the one in this case, see Parts Manufacturing Corp. v. Lynch, 2 Cir., 1942, 129 F.2d 841.

*Eighth:* The trial judge was of the opinion that "[Defendant's] Exhibits A, B, and F without any equivocation demonstrate" that the letters and checks obtained from the Blech files were tainted by the illegal seizure and the subsequent inventory. We think not. Exhibit A was a set of rough notes made by Agent Meglen; the notes comprise a chronology of Agent Meglen's activities concerning the Bacall investigation beginning with October 28, 1966 (and perhaps earlier) and extending to November 29, 1966. Thus the notes cover the period during which the seizure occurred. Exhibit B was a rough draft of a letter concerning the Bacall investigation composed by Agent Meglen and originally intended to be sent to the Director of the Office of Investigations of the Bureau of Customs in Washington, D. C.; a final draft was never sent. The letter contains a detailed explanation of many of the events leading up to the seizure. Neither Exhibit A nor Exhibit B suggests that, before the illegal seizure,

Agent Meglen or any other Customs officer had any intention of undertaking a foreign investigation. Exhibit F is a letter from Drexel Watson, a Customs agent in Los Angeles, to the District Director of Customs in Los Angeles; the letter had been approved by Oscar Polcuch, Customs Agent in Charge in Los Angeles. The letter recounts the seizure and the evidence that Bacall had misdescribed fabric composition and classification on the invoices; it goes on to say:

> "Since it appears unlikely that Bacall will provide this office with any incriminating evidence in the nature of correspondence, records or admissions, we therefore have requested the Regional Customs Representative, Rome, Italy, and the Senior Customs Representative, Paris, France, to contact the manufacturers and shippers in their respective areas and obtain from these people all available records pertaining to Bacall's importations."

Bacall claims that these exhibits demonstrate that, until the seized materials had been inventoried, no consideration had been given to a foreign investigation and that the foreign investigation was undertaken solely as a follow-up to and as a result of the illegal seizure.

The trial judge appeared to accept the argument. All the argument proves, however, is that the foreign investigation would not have been undertaken but for the seizure, and we have already assumed that to be the case. Exhibits A, B, and F have no tendency to prove that the discovery of the letters and checks were "come at by exploitation" of the seizure, which is the controlling issue.

■ The letters and checks obtained from the Blech files were not tainted by the illegal seizure and were admissible into evidence to prove that Bacall had willfully understated the purchase prices.

C. *Introduction into evidence of excerpts from the Bacall deposition was not reversible error.*

On August 24, 1967, the government took a deposition from John Bacall during the consolidated civil cases involving John Bacall Imports, Ltd. Government counsel read excerpts from that deposition into the record in this case, over the objection of counsel for Bacall.[4]

Bacall contends that because the deposition was taken by the government in connection with the replevin action instituted by John Bacall Imports, Ltd., to

---

4. Those excerpts are, in their entirety:
"Q. And you are associated with the plaintiff in this action which is John Bacall Imports, Ltd.?
A. Yes, sir.
Q. And what is the nature of your association?
A. I am the president of the company."
* * * * *
"Q. Since 1960, have you individually or as John Bacall Imports, Ltd., imported fabrics?
A. Yes. John Bacall Imports, Ltd. only.
Q. And how many occasions has John Bacall Imports, Ltd. imported fabrics since 1960?
A. My recollection, sir, was once every year."
* * * * *
"Q. Would the names of the sellers of these fabrics appear on the Customs entry documents which you prepared and submitted?

A. Always. Customs has all the documents to my knowledge."
* * * * *
"Q. Would you pay him before you got the merchandise, or afterwards?
A. It varies, sir. My recollection is that it was done—I mean, that it was never paid before they presented an invoice. You know, they had to present an invoice and this invoice was presented about the time when the merchandise arrived to America, to Los Angeles."
* * * * *
"Q. Do you have any memory or knowledge of whether or not you made a second trip to Europe in the summer of 1966?
A. Not as I can remember."
* * * * *
"Q. Now, after you sold merchandise here in this country, who actually prepared the merchandise to be shipped from your warehouse to your shipper?
A. I did. That is the reason I got a nervous breakdown."

recover the seized goods, his compliance in giving the requested deposition was necessary to vindicate his Fourth Amendment rights, and that, therefore, to use the deposition in a subsequent criminal trial is to force him to choose between asserting his rights under the Fourth Amendment in the forfeiture case and asserting his right not to testify in this case. In support of his argument, Bacall relies primarily on Simmons v. United States, 1968, 390 U.S. 377, 389–394, 88 S.Ct. 967, 976, 19 L. Ed.2d 1247. In *Simmons* the Supreme Court held that "when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." *Id.* at 394, 88 S.Ct. at 976.

We need not decide whether the rule of *Simmons,* which involved a motion to suppress evidence seized in connection with a criminal case, applies equally to a suppression motion made in a criminal case where the evidence sought to be suppressed was taken in connection with a prior civil case. Assuming the *Simmons* rule to apply, we find that admitting the deposition excerpts was harmless beyond a reasonable doubt. Chapman v. California, 1967, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705.

It appears from the record that the government introduced these excerpts only for the limited purpose of showing that "John Bacall personally is responsible for the acts of John Bacall Imports, Ltd.," and that the trial judge was aware of this limitation. Bacall also recognizes this limitation but argues that the deposition supplied "substantial, if not, indeed, the only, evidence connecting [John Bacall] Imports with the offense charged." We think, however, that there was in the record ample evidence to show beyond a reasonable doubt that the business of Bacall personally and the business of John Bacall Imports, Ltd., were indistinguishable. The let-

ters to Blech had "John Bacall Imports, Ltd." letterheads and were signed by John Bacall personally. Some checks were remitted to Blech by John Bacall personally, and others by John Bacall Imports, Ltd. One check was made to the order of John Bacall Imports, Ltd., and was endorsed over to Blech by both John Bacall Imports, Ltd. and John Bacall personally. The Special Customs Invoices generally named as the importer John Bacall Imports, Ltd., but at least four invoices named "M. John Bacall." Finally, the Customs Entries show that H. H. Elder & Co., a customs brokerage firm, acted as attorney-in-fact for John Bacall Imports, Ltd. in all the importations. However, George De La Sierra, the president of H. H. Elder & Co., testified as follows concerning the nature of his business dealings with Bacall:

" * * * *Mr. Bacall* would bring shipments in through [*sic*] once a year approximately. I first became acquainted with him about 1955 or thereabouts, and we assisted *him* in our business as a customs broker in bringing in shipments through the U. S. Customs." (Emphasis added.)

* * * * * *

"Q. And it is your testimony that in all of these seven instances, the invoices were furnished to you *by Mr. Bacall*?

A. Yes, that's right." (Emphasis added.)

* * * * * *

"Q. Sir, what was your business relationship to Mr. Bacall?

A. I have been engaged *by Mr. Bacall* to represent *him* as *his* customs broker." (Emphasis added.)

We think that the evidence described above was easily sufficient to permit a finding that the business of John Bacall and the business of John Bacall Imports, Ltd. were one and the same. Bacall introduced no evidence to the contrary. Under these circumstances, admission into evidence of the excerpts from Bacall's deposition, if it was error, was harmless beyond a reasonable doubt.

**D.** *Introduction of secondary evidence of the contents of an income tax return was not reversible error.*

■ Bacall claims that the trial judge erred in permitting Agent Meglen to testify concerning the amount shown for purchases on the income tax return of John Bacall Imports, Ltd. for the fiscal year ending in 1967. If there was error, it was not prejudicial. On cross-examination Agent Meglen testified that the figures in several returns were not broken down to indicate which individual purchases cost how much. Thus, introduction of the returns did not further the government's case; it may have tended to show that sometime during the years in question Bacall had overstated his prices on some Customs invoices, but it did not tend to show that he did it on the Blech invoices.

**E.** *There is insufficient evidence to sustain a conviction on Count II.*

A careful examination of the records and exhibits in this case reveals that there was adduced at trial *no* evidence showing what cost figure was used on the June 1964 Blech invoice. The figure of 28,141 Francs, used by the government, appears in government counsel's opening argument to the judge, which is not evidence. In a subsequent argument on a motion for acquittal, government counsel again adverted to a figure of about 28,000 Francs for the 1964 importation; this, too, is not evidence. During the latter argument, government counsel appeared to believe that the figure came from Government's Exhibit 17. It did not, for Exhibit 17 is a Customs Entry for an importation from Italy, not from France. According to Count II of the indictment, the 1964 Blech invoice should appear in Customs Entry No. 64–271772, but that Entry was never introduced into evidence (or even marked for identification) in this trial, nor is any testimonial evidence of its contents to be found in the transcript. Accordingly, the government has failed to show

what figure Bacall stated on the invoice for the purchase price of the Blech fabrics imported on June 23, 1964, and has therefore failed to prove that he understated the price.

■ Bacall did not assign this failure of proof as error at the trial. Nor did he argue the failure of proof as grounds for reversal of Count II on appeal, although he did advert to it in the Statement of Facts in his opening brief. This court is reluctant to consider objections raised for the first time on appeal. Ignacio v. People of Territory of Guam, 9 Cir., 1969, 413 F.2d 513, 517 and cases cited; Marshall v. United States, 9 Cir., 1969, 409 F.2d 925, 927. We are considerably more reluctant to notice on our own motion, errors not raised below when the parties have not even urged us to do so. Nonetheless, we are empowered to notice, in our discretion, "[p]lain errors or defects affecting substantial rights" which were brought neither to our attention nor to the attention of the trial court. Rule 52(b), F. R.Crim.P.; Gilbert v. United States, 9 Cir., 1962, 307 F.2d 322, 325. We may do so when confronted with "unusual circumstances involving seriously prejudicial deficiencies in the trial process," Reisman v. United States, 9 Cir., 1969, 409 F.2d 789, 791, or when "it appears to be necessary in order to prevent a miscarriage of justice or to preserve the integrity and reputation of the judicial process." Davis v. United States, 9 Cir., 1970, 425 F.2d 673, 674.

■ Bacall's conviction on Count II satisfies these criteria. There is no evidence in the record that Bacall ever did the act for which his conviction lies. To convict him nonetheless would certainly involve a "seriously prejudicial deficienc[y] in the trial process" and a clear "miscarriage of justice," and would cast great doubt on "the integrity and reputation of the judicial process." The failure to introduce into evidence Customs Entry No. 64–271772 may have been a momentary lapse on the part of government counsel, but it represents too cru-

cial a flaw in the criminal process to permit the convictions to stand.

The convictions of each appellant on Count II of the indictment are reversed. In all other respects, the judgments are affirmed.